# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



Kenneth Parks and William Seymour,
On Behalf Of Themselves And All Others
Similarly Situated,

           Plaintiffs,

    v.

Fairfax Financial Holdings LTD., V. Prem
Watsa, Trevor Ambridge, M. Jane
Williamson, Anthony F. Griffiths, Robbert
Hartog, Bradley P. Martin, and Banc of
America Securities LLC,

           Defendants.

Civil Action No.

06 CV 2820

CLASS ACTION COMPLAINT
FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS

JURY TRIAL DEMANDED

RECEIVED
APR 11 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, alleges the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by and through their attorneys, which included, amongst other things, a review of the defendants' press releases, Securities and Exchange Commission ("SEC") filings by Fairfax Financial Holdings LTD. ("Fairfax" or the "Company") and media reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is in part a securities fraud class action brought on behalf of investors who purchased public debt securities of Fairfax between March 24, 2004 and March 21, 2006 inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5 (the "Class").

2.     The debt securities at issue in this Complaint are:

     a.    7.75% notes maturing 04/26/12 ("7.75% Notes");

     b.    8.25% notes maturing 10/01/15;

     c.    6.875% notes maturing 4/15/08;

     d.    8.3% notes maturing 4/15/26; and

     e.    7.375% notes maturing 4/15/18.

3.     This action also is brought on behalf of a sub-class of Class members who purchased the 7.75% Notes pursuant to or traceable to the Offering Materials (defined below) filed by Fairfax with the SEC on August 25, 2004 to effectuate a $95 million aggregate principal amount debt flotation who suffered damages (the "Sub-Class"). Members of the Sub-Class are seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") 15 U.S.C. §§ 77k and 77l and these claims do not sound in fraud.

4.     Defendants are Fairfax and V. Prem Watsa, the Company's Chairman and Chief Executive Officer ("CEO") and other members of Fairfax's management (defined below), who signed the Offering Materials.

5.     During the Class Period, defendants engaged in a course of conduct designed to omit material information from the public marketplace concerning the Company's exposure to non traditional insurance and reinsurance agreements entered into by the Company and its numerous subsidiaries and affiliates, including Odyssey Re Holdings Corp. ("Odyssey").

6.     The Company's Class Period financial statements also failed to disclose that the Company's current reserve accounts and those maintained by its subsidiaries and affiliates were similarly understated.

7.      Further, the Company misrepresented its exposure to the risks associated with Odyssey's finite reinsurance contracts and that the Company's run-off operations required material restructuring and additions to reserves.

8.      Additionally, on or about August 24, 2004, defendants effectuated a public flotation of the 7.75% notes by means of the Offering Materials. The Offering Materials omitted material information concerning the Company's true state of affairs, exposure to regulatory scrutiny and other matters detailed below. The claims brought by the members of the Sub-Class do not sound in fraud.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act.

10.     This Court has personal jurisdiction over defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa.

11.     Venue is proper in this district pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), because many of the alleged acts, transactions and conduct constituting violations of law, including the issuance, and dissemination to the investing public of materially false and misleading information, occurred, at least in part, in this district.

12.     In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and facilities of the national securities exchanges.

## PARTIES

13.    Plaintiffs Kenneth Parks and William Seymour, as set forth in the accompanying certifications, purchased Fairfax debt securities at artificially inflated prices during the Class Period as described in the attached certification and were damaged thereby.

14.    Fairfax, through its subsidiaries, engages in property and casualty insurance and reinsurance conducted on a direct basis principally in Canada, the United States, and the United Kingdom. It also provides claims adjusting, appraisal, and loss management services. In addition, Fairfax operates in continental Europe, the Far East, Latin America, and the Middle East.

15.    The Company was incorporated in 1951. It was formerly known as Markel Service of Canada Limited and subsequently changed its name to Markel Financial Holdings Limited. Further, the name was changed to Fairfax Financial Holdings Limited in 1987. The Company is headquartered in Toronto, Canada.

16.    Fairfax is listed on The Toronto Stock Exchange under the symbol "FFH.SV" and the New York Stock Exchange under the symbol "FFH".

17.    The Company operates through a complicated web of subsidiaries and affiliates:

(a)    Northbridge, based in Toronto, provides property and casualty insurance products through its Commonwealth, Federated, Lombard and Markel subsidiaries, primarily in the Canadian market as well as in selected U.S. and international markets. Northbridge is a public company of which Fairfax owns 59.2%.

(b)    Crum & Forster (C&F), based in Morristown, New Jersey, is a national commercial property and casualty insurance company in the United States writing a broad range of commercial coverage. Its subsidiary Seneca Insurance provides property and casualty insurance to small businesses and certain specialty coverage.

(c)    Fairmont Insurance, based in Houston, writes specialty niche property and casualty and accident and health insurance.

(d)    SRO Napa, a managing general underwriter based in Napa, California with six regional underwriting offices across the United States, underwrites specialized excess casualty and excess property business on behalf of unaffiliated insurers and reinsurers.

(e)    Falcon Insurance, based in Hong Kong, writes property and casualty insurance to niche markets in Hong Kong.

(f)    First Capital, based in Singapore, writes property and casualty insurance primarily to Singapore markets.

(g)    Odyssey, based in Stamford, Connecticut, underwrites treaty and facultative reinsurance as well as specialty insurance business, with principal locations in the United States, Toronto, London, Paris, Singapore and Latin America. Fairfax owns 80% of Odyssey's equity.

18.    The Company also operates a "U.S. runoff group" resulting from the December 2002 merger of TIG and International Insurance.

19.    The European runoff group consists of RiverStone Holdings and Dublin, Ireland-based nSpire Re.

20.    The Company's Lindsey Morden Group provides a wide range of independent insurance claims services, including claims adjusting, appraisal and claims and risk management services, through a worldwide network of branches in Canada, the United States, the United Kingdom, continental Europe, the Far East, Latin America and the Middle East. Lindsey Morden Group Inc. is a public company of which Fairfax owns 75.0% of the equity and 89.0% of the voting power over the Company.

21.    As the majority of the Company's operations are in the United States or conducted in U.S. dollars, effective December 31, 2003, the Company began reporting consolidated financial statements in U.S. dollars.

22.    Defendant V. Prem Watsa is the Company's Chairman and CEO since 1985. Mr. Watsa controls an entity called The Sixty Two Investment Company Limited ("Sixty Two") that owns 50,620 subordinate voting shares and 1,548,000 multiple voting shares, representing 47.6% of the total votes attached to all classes of the Company's shares (100% of the total votes attached to the multiple voting shares and 0.3% of the total votes attached to the subordinate voting shares). Mr. Watsa beneficially owns an additional 255,552 subordinate voting shares and exercises control or direction over an additional 2,100 subordinate voting shares. These shares, together with the shares owned directly by Sixty Two, represent 48.4% of the total votes attached to all classes of the Company's shares (100% of the total votes attached to the multiple voting shares and 1.8% of the total votes attached to the subordinate voting shares).

23.    Mr. Watsa has served as Vice President of Hamblin Watsa Investment Counsel Ltd. since 1985.

24.    Mr. Watsa is the Chairman of Northbridge, Crum & Forster, Odyssey, and Lindsey Morden Group Inc., all of which are subsidiaries of the Company.

25.    By reason of his direct and substantial management position and responsibilities over Fairfax and its subsidiaries and affiliates, Mr. Watsa is a "control person" of Fairfax within the meaning of the federal securities laws, had the power and influence to control Fairfax, and exercised that control to cause Fairfax to engage in the violations and improper practices complained of herein. Mr. Watsa had access to adverse non-public information about Fairfax's

operations, and acted to conceal and misrepresent such material information in violation of his duties and responsibilities under the federal securities laws.

26.     It is appropriate to presume that the false, misleading, and incomplete information conveyed in Fairfax's press releases, public statements, and other publications as alleged herein are the actions of Mr. Watsa.  Mr. Watsa directly participated in the management of Fairfax and its subsidiaries and affiliates, was directly involved in the day-to-day operations of Fairfax at the highest levels, and was privy to confidential proprietary information concerning the Company and its operations, as alleged herein.  Mr. Watsa was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, was aware of or recklessly disregarded the fact that false and misleading statements were being issued regarding Fairfax, and approved or ratified these statements in violation of the federal securities laws.

27.     This actions also alleges claims under the Securities Act against Mr. Watsa and several officers and directors who signed the false and misleading Offering Materials:

    a.     Trevor Ambridge, Chief Financial Officer until May 13, 2005 and current Vice President (Principal Financial) of Fairfax.

    b.     M. Jane Williamson, Vice President (Principal Accounting Officer) of the Company.

    c.     Anthony F. Griffiths, a Director of the Company.

    d.     Robbert Hartog, a Director of the Company.

    e.     Bradley P. Martin, Vice President and Corporate Secretary to the Company.

28.     Defendants Watsa, Ambridge, Williamson, Griffiths, Hartog and Martin are collectively known as the "Individual Defendants."

29.     Banc of America Securities LLC - an affiliate of Bank of America Corporation - together, "Bank of America" is a member of the NYSE, NASD, and SIPC. Banc of America represents itself to be:

> a powerful leader in the global debt capital markets. Issuers across all industries and investment ratings count on us for comprehensive, integrated capital raising solutions. And we deliver the specialized expertise, innovative thinking, industry focus, broad distribution and exceptional execution they need to achieve an efficient and effective capital structure.

## THE FALSE REGISTRATION MATERIALS

30.     On August 25, 2004, Fairfax filed with the SEC a prospectus (the "Prospectus"), dated August 24, 2004 offering $95 million aggregate principal amount of 7.75% senior notes due 2012 (the previously defined 7.75% Notes.)

31.     Annexed to the Prospectus is an earlier filed prospectus dated April 20, 2004 (referred to as the "Base Shelf Prospectus") accompanied by a Registration Statement on Form F-10, filed with the SEC on April 20, 2004.

32.     With respect to the integration of the Prospectus and Base Shelf Prospectus, the Company stated:

> This prospectus supplement is deemed to be incorporated by reference into the accompanying base shelf prospectus dated April 20, 2004 solely for the purpose of this offering [and] if the information varies between this prospectus supplement and the accompanying base shelf prospectus, the information in this prospectus supplement supercedes the information in the accompanying base shelf prospectus.

33.     Accordingly, the Prospectus, and the Base Shelf Prospectus and its Registration Statement on Form F-10 are hereinafter referred to as the "Offering Materials."

34.     The Offering Materials state that they:

> represent a further issuance of the 7 3/4% senior notes due 2012
> previously issued by us in an aggregate principal amount of
> $171,483,000. The notes issued hereby and the 7 3/4% senior notes
> due 2012 previously issued by us will bear the same CUSIP
> number and will constitute a single series of our debt securities.

***

> This document is in two parts. The first part is this prospectus
> supplement, which describes the terms of the notes that we are
> currently offering. The second part is the accompanying base shelf
> prospectus, which gives more general information, some of which
> may not apply to the notes that we are currently offering.
> Generally, the term "prospectus" refers to both parts combined.

> You should read this prospectus supplement along with the
> accompanying base shelf prospectus. You should rely only on the
> information contained in or incorporated by reference in this
> prospectus supplement and the accompanying base shelf
> prospectus.

35.     The Base Shelf Prospectus portion of the Offering Materials state:

> We may offer from time to time, during the 25 month period that
> this prospectus, including any amendments hereto, remains
> effective, up to US$750,000,000 of the securities listed above in
> one or more series or issuances and their total offering price, in the
> aggregate, will not exceed US$750,000,000. Our securities may be
> offered separately or together, in amounts, at prices and on terms
> to be determined based on market conditions and set forth in an
> accompanying shelf prospectus supplement.

36.     Under the section entitled Recent Developments, the Offering Materials stated:

> Second Quarter Operating Results. On July 29, 2004, we
> announced our financial results for the six-month period ending
> June 30, 2004.

> For the three months ending June 30, 2004, we had net premiums
> written of $1.2 billion, total revenue of $1.4 billion and net income
> of $46.0 million. For the corresponding period in 2003, we had net
> premiums written of $1.1 billion, total revenue of $1.6 billion and
> net income of $173.7 million. Our combined ratio for our
> continuing operations was 94.9% for the three months ended June
> 30, 2004 versus 98.5% for the corresponding period in 2003.

For the six months ending June 30, 2004, we had net premiums written of $2.4 billion, total revenue of $2.9 billion and net income of $85.5 million. For the corresponding period in 2003, we had net premiums written of $2.2 billion, total revenue of $3.0 billion and net income of $275.2 million. Our combined ratio for our continuing operations was 95.3% for the six months ended June 30, 2004 versus 98.3% for the corresponding period in 2003.

Capital Markets Transactions. On July 30, 2004, certain of our affiliates sold 3,100,000 shares of common stock of Zenith National Insurance Corp. (NYSE: ZNT), at $43.00 per share, resulting in aggregate net proceeds to those affiliates of $127.6 million.

On May 18, 2004, we completed the sale of 6,000,000 common shares of Northbridge Financial Corporation (TSX: NB) at a price of Cdn$25.60 per share. As a result of the sale, Fairfax received aggregate net proceeds of approximately Cdn$146.0 million and reduced its ownership position from 71.0% to 59.2%.

On April 29, 2004, we closed our note exchange offers, under which $204.6 million of our outstanding notes due 2005 through 2008 were exchanged for a cash payment of $59.4 million (including accrued interest) and $160.4 million aggregate principal amount of our 7 3/4% senior notes due 2012. On June 29, 2004, we exchanged an additional $10.0 million of our outstanding senior notes due 2006 for $11.0 million of our 7 3/4% senior notes due 2012.

Estimate of Losses from Hurricane Charley. On August 23, 2004, we announced that our initial estimate of aggregate potential net losses relating to Hurricane Charley will be in the range of $35 million to $40 million after tax and minority interests. This initial estimate was based on a preliminary review and consultation with our insurance and reinsurance companies, including OdysseyRe, Crum & Forster and Northbridge. We recognize that at this early stage it is not possible to make a calculation of our financial exposure to claims relating to Hurricane Charley with a high degree of certainty.

37.    The Company stated that the proceeds of the offering would be used as follows:

We estimate that we will receive net proceeds for this offering of approximately $90.9 million, after deducting the estimated underwriting commissions and offering expenses payable by us. We intend to use the net proceeds from this offering to purchase our outstanding debt from time to time, based on market

conditions. To the extent we are unable to purchase our outstanding debt at prices we believe are reasonable, we will use the proceeds from this offering for general corporate purposes. Pending such use, such net proceeds are expected to be invested in sort-term marketable investments.

38.    With respect to disputes over the notes, the Company consented to jurisdiction in New York:

Consent to Jurisdiction

The indenture provides that we will irrevocably appoint CT Corporation System, 111 Eighth Avenue, New York, New York 10011 as our authorized agent for service of process in any legal action or proceeding arising out of or relating to the indenture or the notes for actions brought under federal or state securities laws or for actions brought by either trustee in any New York Court, and will irrevocably submit to the jurisdiction of the New York Courts for such purposes.

Governing Law

The indenture and the notes will be governed by and construed in accordance with the laws of the State of New York.

39.    Subject to the terms and conditions of an underwriting agreement, defendant Bank of America agreed to purchase from Fairfax, and Fairfax agreed to sell to Bank of America $95 million principal amount of the 7.75% Notes.

40.    On August 24, 2004, the Company issued a press release over *Business Wire* that announced the offering and directed investors to Bank of America's New York prospectus office for copies of the Offering Materials.

41.    On August 27, 2004, the Company announced over the *Business Wire* that the offering was successfully completed and as part of its continuing "deleveraging" efforts and repurchase older debt.

42.    Defendants Watsa, Williamson, Ambridge, Griffiths, Hartog, and Martin signed the Offering Materials.

43.    These statements in the Offering Materials were false and misleading because they omitted material information.

44.    The Offering Materials failed to detail the Company's increasing liquidity problems.

45.    The Company omitted material information concerning second quarter 2004 transactions between Odyssey and Fairfax and that the arrangements were structured to avoid a liquidity squeeze at Fairfax that would have occurred during the quarter.

46.    The Offering Materials omitted material information concerning Fairfax's exposure stemming from the need to collateralize run-off business.

47.    The Offering Materials omitted material information concerning the Company's reserves and whether they were adequate to address the Company's growing run-off operations.

48.    The Offering Materials omitted material information concerning the Company's growing exposure to finite reinsurance agreements with the overall organization.

49.    The Offering Materials omitted material information concerning Fairfax's highly leveraged balance sheet and further omitted material information concerning the Company's equity position.

## COUNT I

### ON BEHALF OF THE SUB-CLASS AGAINST DEFENDANTS FAIFAX, THE INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANT FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

50.    Plaintiffs reallege and incorporate by reference the allegations from paragraphs 1-49, as though fully set forth herein, excluding allegations sounding in fraud.

51.    This Count is brought by Plaintiffs Parks and Seymour on behalf of the Sub-Class pursuant to Section 11 of the Securities Act against the Individual Defendants and the Underwriter Defendant.

52.    The Offering Materials contained materially false and misleading statements and omitted material facts as set forth above.

53.    Pursuant to Section 11 of the Securities Act, the Sub-Class is entitled to recover its damages jointly and severally from the Individual Defendants, as persons who signed the Registration Statement, and from the Underwriter Defendant as underwriter of the debt offering.

54.    Plaintiffs and the other members of the Sub-Class purchased the 7.75% notes without knowledge of the material false statements and omissions alleged herein.

55.    By reason of the above, the Individual Defendants and the Underwriter Defendant violated Section 11 of the Securities Act and are liable to plaintiffs and the members of the Sub-Class, each of whom has been damaged by reason of the violation.

56.    Plaintiffs commenced this action within one year from having discovered the untrue statements and omissions and within three years from the filing of the Offering Materials.

## COUNT II

### ON BEHALF OF THE SUB-CLASS AGAINST, THE INDIVIDUAL DEFENDANTS AS CONTROLLING PERSONS UNDER SECTION 15 OF THE SECURITIES ACT

57.    Plaintiffs reallege and incorporate by reference the allegations from paragraphs 1-56, as though fully set forth herein, excluding allegations sounding in fraud.

58.    The Individual Defendants, by reason of their management positions, are controlling persons of Fairfax within the meaning of Section 15 of the Securities Act and are liable for Fairfax's violation of Sections 11 of the Securities Act as set forth herein.

59.    As set forth herein, Messrs. Watsa and Ambridge were Fairfax's CEO and CFO, respectively.  Furthermore, Mr. Watsa Chairman was of Fairfax's Board of Directors.  As such, the Individual Defendants were capable of causing, and did in fact cause, Fairfax to sell the 7.75% pursuant to the Offering Materials.

60.    By virtue of their high-level positions of control, their ownership of Fairfax's securities and/or their participation in the Company's operations, the Individual Defendants had the power to influence and control and did influence and control the decision-making of the Company.  The Individual Defendants were provided with or had unlimited access to copies of the Offering Materials prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.    By virtue of their positions as controlling persons, the Individual Defendants are liable, pursuant to Section 15 of the Securities Act, for the Company's false and misleading statements and omissions in the Offering Materials and its violation of Sections 11 of the Securities Act.

## SUBSTANTIVE ALLEGATIONS CONECERNING PLAINTIFFS' FRAUD-BASED CLAIMS

62.    On March 23, 2004, Fairfax announced over the *Business Wire* that subject to market and other conditions:

> It intends to offer to exchange up to U.S.$275.0 million principal amount of its existing 7.375% Senior Notes due 2006 and up to U.S.$170.0 million principal amount of its existing 6.875% Senior Notes due 2008 (collectively the "Existing Notes") for a combination of cash and new notes.

63.    Commenting on the purpose of the exchange, the Company stated:

> The purpose of the contemplated exchange offer is to refinance and reduce a portion of the Company's outstanding debt and to diversify its debt maturity profile as part of the Company's deleveraging plan, which is intended to strengthen its debt ratings

to investment grade. Consistent with this plan, the Company intends to reduce its financial leverage through the reduction of its outstanding debt and continued growth in its shareholders' equity.

64.     On March 29, 2004, the Company issued a press release over *Business Wire* concerning the exchange offer of public debt and other debt registered pursuant to 144(A):

> Concurrent with the exchange offer described above, the Company is also making an offer to exchange up to U.S.$275.0 million principal amount of its existing 7.375% Senior Notes due 2006 (the "2006 Notes") and up to U.S.$170.0 million principal amount of its existing 6.875% Senior Notes due 2008 (the "2008 Notes") for a combination of cash and new notes with the same terms as the new notes offered hereby. A registration statement relating to the offer to exchange the 2006 Notes and 2008 Notes for cash and new notes has been filed with the Securities and Exchange Commission.

65.     On March 29, 2004, the Company filed Amendment No. 1 to Form F-10 Registration Statement concerning the exchange offer. The Form F-10 stated:

> The new notes will mature on April 26, 2012 and will bear interest from the settlement date at an annual rate of 7 ¾%. Interest will be payable semi-annually on each April 30 and October 31, commencing on November 1, 2004, being the first business day following October 31, 2004.
>
> The new notes will be our direct, unsecured obligations and will rank equally and ratably with all of our other unsecured and unsubordinated indebtedness.
>
> All other terms of the new notes will be substantially identical to those of the old notes. The new notes will be issued under the same indenture and have the same covenants as the old notes. For a description of the terms of the new notes and the indenture pursuant to which the new notes will be issued, see "Description of the New Notes."

66.     The Form F-10 stated that Mr. Watsa controls a substantial block of the Company's equity:

> The Senior Management Team is led by Mr. Prem Watsa, who has been our Chairman and Chief Executive Officer since September 1985. Mr. Watsa holds 12.7% of all classes of our outstanding

shares whole controlling 55.3 % of the votes associated with our outstanding shares. In total, our officers and directors hold 15.5% of all classes of our outstanding shares.

67.     The Form F-10 further detailed that the offering was part of a deleveraging plan, designed to return the Company's credit rating to investment grade, instead of "junk" status:

**Deleveraging Plan**

We have established a deleveraging plan which is intended to strengthen our debt ratings to investment grade. As part of this plan, we intend to reduce our financial leverage through the reduction of our holding company debt by $73.6 million. Reduction of our holding company debt may be achieved through the redeployment of excess capital generated by our operating subsidiaries and cash generated by a range of financing activities which may be completed from time to time. While we can not be assured that we will achieve an upgrade of our debt ratings, we believe our deleveraging plan will increase our financial strength and enhance the financial strength ratings of our insurance companies.

68.     The risk disclosures accompanying the offering spoke generally about the need to retain adequate reserves to cover estimated unpaid liabilities. The disclosures also contain language concerning the need to remain in a favorable position with rating agencies.

69.     With respect to regulatory oversight, the Company stated generally that it operates in a scrutinized regulatory arena. But the Company does not discuss the specific risks associated with writing finite insurance arrangements or the legal and regulatory risks associated with writing non traditional insurance agreements.

70.     Mr. Watsa signed the document in his capacity as Chairman and CEO of the Company.

71.     On March 30, 2004, *A.M. Best Company, Inc.* ("*A.M. Best*"), over the *BestWire* reported that the purpose of the debt exchange was "to reduce some debt as part of a plan to strengthen its debt ratings to investment grade."

16

72.     Further commenting on the Company's need to strengthen its financial position and improve its deteriorating reputation among credit ratings agencies, *BestWire* stated:

> Fairfax's objective is to refinance and reduce a portion of its outstanding debt and to diversify its debt maturity profile as part of the company's deleveraging plan, the company said.
>
> That plan is intended to strengthen its debt ratings to investment grade. Consistent with this plan, the company intends to reduce its financial leverage through the reduction of its outstanding debt and continued growth in its shareholders' equity, Fairfax said.
>
> At the same time, Fairfax is also offering some qualified institutional buyers an exchange of any and all of the $97.7 million principal amount of 8.125% Senior Notes due 2005 of TIG Holdings Inc. for a combination of cash and new notes of Fairfax.

73.     On April 20, 2004, the Company filed a prospectus with the SEC dated April 20, 2004. The prospectus was accompanied by a Registration Statement on Form F-10.

74.     On April 30, 2004, the Company reported that first-quarter 2004 results declined by 61% due to increased interest expenses and losses at a U.S. subsidiary.

75.     According to reports published over several newswires, Fairfax, which reports in U.S. dollars, earned US$39.5-million (US$2.63 a share) during the quarter ended March 31. That compared with US$101.5-million ($6.97) in the year-earlier quarter. Revenue grew to US$1.48-billion from US $1.33-billion.

76.     The Company blamed the decrease in profits on lower realized gains, increased interest expense and losses at its Lindsey Morden Group subsidiary.

77.     Also on April 30, 2004, the Company hosted an earnings conference call to discuss the financial results.

78.     Commenting on the quarter, Mr. Watsa detailed his plan to raise the Company to investment grade:

Next I want to highlight the most important objective that we have today for Fairfax, to be rated as investment-grade again. We plan to accomplish this in the old-fashioned way, by producing excellent results and reducing our leverage at the holding company. In this connection we made an exchange offer for 540 million of our bonds maturing in the next five years. We offered a little less than 30 percent in cash and the rest in 2012 bonds. We announced yet today that approximately 205 million or 38 percent of the 540 million were tendered. Our objective is to significantly reduce, if not eliminate, all maturities in the next five years. We want to achieve this objective while maintaining our historical levels of cash in the holding company. You'll hear more on this from Trevor.

*      *      *

Summing up then, California has allowed us to remove 660 million from the TIG trust and defer for one year, as Dennis and Trevor have said, the $100 million note to TIG. We now have more than 1 billion in marketable securities in our holding company not including our cash position. Second, our deleveraging plan has begun, our exchange offer was very successful. We plan to continue this while maintaining our historical levels of cash in the holding company. Three, insurance and reinsurance operations continue to produce strong results with combined ratios less than 100 percent with significant growth in net premiums written. Four, our investment portfolios are very well positioned to take advantage of opportunity. And finally, our runoff continues to be extremely well managed by Dennis and his team.

79.    With respect to lowering the Company's debt, Mr. Watsa stated in response to an analyst's question:

SUTEEN LEE, ANALYST, PUTNAM LOVELL: Putnam Lovell. Can you give me the total debt number after the exchange offer at the holding company level?

PREM WATSA: At the holding company, what happens is that – what we've done – you'll see that we have taken $205 million of debt and we've exchanged that for $160 million of 2012 notes. So we've reduced the debt by about $58 million.

*      *      *

PREM WATSA: So our debt has come down. And, as I said to you on the call, that we are very focused. We've got 540 less the

18

205 that we've just retired; so there's close to 340 million – 335 million remaining in the next five years and we're very much focused on reducing that as the year goes by.

80.     Following the release of the first quarter earnings and conference call, *A.M. Best*, assigned a debt rating of "bb+" to Fairfax's 7.75% senior unsecured notes due 2012 issued as part of its debt exchange offer and stated, "[t]he outlook for all debt ratings remains negative." *A.M. Best* further commented on the basis for the negative outlook:

> The negative outlook reflects A.M. Best's concerns regarding continued negative loss reserve development at Fairfax's run-off operations, which could result in significant earnings volatility and potential disruption of dividends from wholly owned subsidiaries. In 2003, reserve development was offset by sizable realized gains. Despite a history to the contrary, expectations in 2004 are for a more modest level of realized gains.

81.     On May 3, 2004, *A.M. Best* reiterated its ""bb+" rating to Fairfax Financial Holdings Ltd.'s 7.75% senior unsecured notes due 2012 issued as part of the company's debt exchange offer.  The outlook on all the debt ratings remains negative."

82.     On July 30, 2004, the Company released is quarterly results for second quarter 2004 where the *National Post,* citing *Reuters* reported:

> Fairfax Financial Holdings Ltd.'s second-quarter profit dropped 74%, as the year-before quarter's results benefited from investment gains, the company said yesterday.
>
> Net income at the financial holding company, whose interests include property, casualty and life insurance units, was US$46-million, or US$3.05 a share, in the quarter, down from US$173.7-million, or US $12.09 a share, in the year-before period.
>
> Fairfax realized gains on investments totaling $578.1-million in the year-before period. Revenue for the quarter retreated 11.9% to US$1.44-billion from US$1.63-billion.

83.    Following the earnings release, the Company hosted a conference call with securities industry analysts.  Commenting on the quarter's results and the Company, Mr. Watsa emphasized the importance of achieving an investment grade ranking:

> Finally, I wanted to highlight the most important objective that we have for Fairfax; to be rated as investment grade again.  We plan to accomplish this as I said last quarter in the old-fashioned way, by producing excellent results and reducing our leverage at the holding company.  In this regard our objective is to significantly reduce if not eliminate all maturities in the next five years.  We have exchanged 40 percent of the 540 million coming due in 2005 and 2008 for our bonds due in 2012.  We are working on the rest of the maturities.

84.    On August 24, 2004, numerous news sources reported and the Company confirmed that it was exposed to significant claims stemming from damage caused by Hurricane Charley.  This was followed on the heels of the Company trading as low as $181 per share on Friday, August 20, 2004, a 14-month low.  The exposure to this potential massive liability also cast a shadow over Mr. Watsa's plan to raise the Company's debt to investment grade.

85.    Presented with the possibility that it would have to pay huge claims associated with Hurricane Charley, on August 25, 2004, Fairfax filed with the SEC a prospectus (the "Prospectus"), dated August 24, 2004 offering $95 million aggregate principal amount of 7.75% senior notes due 2012 at an issue price of 97.25 (the 7.75% Notes defined above).

86.    In the news release, the Company said it will use the proceeds from this offering to buy its outstanding debt from time to time, based on market conditions.

87.    On August 31, 2004, a very public dispute erupted between Fairfax and *Fitch Ratings* – a well respected credit rating agency.

88.    Specifically, *Fitch Ratings* in a very pointed analysis published over the *Business Wire* stated:

[Fitch] placed the ratings of Fairfax Financial Holdings Limited (Fairfax) and its rated subsidiaries and affiliates on Ratings Watch Negative. See complete list below. The ratings previously had a Negative Outlook.

This action largely reflects Fitch's concerns as to increasing liquidity pressures at Fairfax, as well as a continued decline in transparency of management's public disclosures, which make it increasingly difficult for third parties to judge Fairfax's creditworthiness.

Fitch intends to resolve its Rating Watch within several weeks, following additional analysis of publicly available information. Barring an increase in our comfort level, Fitch expects to downgrade and/or withdraw Fairfax's ratings. A withdrawal will occur if Fitch determines that the company's disclosures do not allow for a reasonable assessment of the financial health of Fairfax as a whole. This would relate primarily to the myriad of evolving intercompany transactions and ownership relationships, both on- and off-shore, as well as a lack of adequate disclosures regarding certain entities and transactions that could effect parent company liquidity.

While Fairfax's financial disclosures have become more voluminous over the years, Fitch has been concerned by an increasing lack of specific and readily available disclosures. Specifically, Fitch's heightened concern largely stems from: an inability to reconcile second quarter holding company cash based on public disclosures; the complex series of transactions related to the Kingsmead run-off syndicates that appears to have been the catalyst for movement of the Advent collateral to Odyssey Re as provider; and a number of ownership changes and preferred stock issuances among significant subsidiaries, the rationale of which is unclear.

Fitch believes that Fairfax may have averted a liquidity squeeze in the second quarter of 2004 resulting from its need to support the collateralization of the Kingsmead run-off. Per disclosures in its second quarter 2004 10-Q, it appears that majority-owned Odyssey Re provided US$200 million in collateral balances via an 'arm's length' fee-based transaction. If such an 'arm's length' transaction could not have been arranged, Fitch is concerned whether Fairfax's cash balances would have been largely depleted if it had to cover the $200 million funding requirement. Furthermore, given the potential magnitude of the collateral requirements on Fairfax's liquidity, Fitch is concerned that the possible need for such funding

was not disclosed specifically by Fairfax other than through the SEC disclosure made by Odyssey Re.

Additionally, Fitch is concerned that such a potential cash squeeze occurred after Fairfax's operating subsidiaries had been experiencing their most favorable market conditions in years. Fitch believes that Fairfax requires a return to profitability and strong operating cash flows from its core operating subsidiaries to truly turn around its fortunes. However, many market observers have indicated a softening of rates has begun in Fairfax's key markets.

Finally, Fitch also remains concerned by the adequacy of Fairfax's reserves for its growing runoff operations, uncertainty as to the true financial position of nSpire Re Limited and its abilities to perform on intercompany reinsurance transactions, the significant use of finite reinsurance within the organization, and Fairfax's highly leveraged balance sheet and low levels of tangible equity.

Fitch's ratings of Fairfax are based primarily on public information.

89.   The Company quickly engaged in a public relations campaign to comfort investors, especially debt holders, that *Fitch* was either incorrect in its analysis or was pushing a hidden agenda.  Indeed, *Fitch's* report did not bode well for the Company's achieving investment grade status in the near future.  Specifically, later on August 31, the Company issued a press release refuting *Fitch* and requesting that *Fitch* withdraw the opinion:

Fairfax Financial Holdings Limited (NYSE:FFH) (TSX:FFH) confirms that it maintains relationships with four major ratings agencies, in the course of which it meets with those agencies and provides them all information necessary or requested by them in order to permit them to perform their ratings functions. The information given by a company to ratings agencies necessarily involves a level of detail beyond its public disclosures which provide all material disclosure relating to the company's results and financial state.

As previously disclosed, Fairfax does not maintain a relationship with Fitch Ratings. Fairfax has not met with Fitch or provided information to Fitch since the spring of 2003 and since that time has requested Fitch to withdraw its ratings on Fairfax.

90.    This public dispute continued to generate significant press coverage because on one hand a reputable ratings agency called into question the core of the Company's financial integrity and on the other, the Company stated that *Fitch* was flatly wrong because *Fitch* was not privy to the types of inside information generally afforded to ratings agencies during the review process.    The Company, however, did not contest the specific allegations raised by *Fitch*. Instead, it simply stated that they were inaccurate, *Fitch* was *persona non grata*, and the Company communicated with other rating agencies.

91.    *The Globe and Mail* followed the debate and published an article on September 3, 2004 entitled: *Fairfax hissy fit doesn't change fact Fitch is right.*

92.    The article detailed that:

> Hostilities between Fairfax and Fitch reached a new level this week, but in fact they've been going on for at least 18 months. In early 2003, Fitch slammed Fairfax for repaying a debt with cash when it had perilously little in the bank and could have paid with shares instead. Then it downgraded the company's debt to B-plus, firmly in the junk category.

> Mr. Watsa, in turn, told Fitch to take a hike. Fairfax management refused to meet the firm's analysts or pay it to rate the company's debt. Credit analysts are usually given inside information to help them form their opinions, privileged access that can be crucial to understanding an insurance company, especially one with a recent history like Fairfax's. Weeks after giving Fitch the boot, Mr. Watsa attacked credit agencies at Fairfax's annual meeting, saying: "One of their biases is that companies that haven't done well in the past are unlikely to do well in the future. We think that's wrong."

> A little sensitive, no?

> The standoff has rolled on since then "Fairfax wants Fitch to bugger off, and the rating agency just won't. On Tuesday, it put out another report and placed the company on "credit watch negative," which means it could be downgraded again. So Fairfax released a statement to remind the world that Fitch analysts are about as welcome in Mr. Watsa's offices as Richard Breeden would be at one of Conrad Black's famous dinner parties. "Fairfax has not . . . provided information to Fitch since the spring of 2003 and since

that time has requested Fitch to withdraw its ratings on Fairfax."
Go away, already!

Mr. Watsa would be better off, though, if he spent less time trying
to chase away his unwanted intruder and more responding to the
substance of Fitch's reports. Forget the feud. The things the rating
agency complains about are the same items that weigh down
Fairfax shares: the high level of debt; the questionable nature of
some of its assets, such as goodwill that should have been written
off; the use of finite reinsurance, a financial-engineering
mechanism to which cash-poor companies sometimes resort; the
complicated web of transactions between subsidiaries.

For example, Fitch charges that Fairfax might have avoided a
"liquidity squeeze" in the second quarter only because it devised a
complex deal that involved a partially owned subsidiary coming up
with $200-million. Without that deal, the agency said, "Fitch is
concerned whether Fairfax's cash balances would not have been
largely depleted," hardly a comforting thought. (Fairfax
executives, as is their custom, did not return calls.)

What's worse is that Fairfax continues to operate without much of
a cash safety net even after its subsidiaries have enjoyed "their
most favourable market conditions in years," Fitch analysts said.
Look at your bill for house insurance or car insurance: Are you
paying more than you were three years ago? Sure you are. But
there are signs the so-called "hard market" in property-and-
casualty insurance is starting to soften, too soon for Fairfax, which
has only begun the long process of repairing its balance sheet.

"Fitch believes that Fairfax requires a return to profitability and
strong operating cash flows from its core operating subsidiaries to
truly turn around its fortunes," Fitch analysts said. Well, okay,
they're on the Fairfax blacklist, and they have an axe to grind. But
in this case, they're not wrong. Maybe that's why they're getting
under Mr. Watsa's skin.

93.     On September 3, 2004, in the wake of the dispute over the Company's actual

creditworthiness, it announced that it had completed the previously discussed debt offering:

Canada-based insurance group Fairfax Financial Holdings Ltd.
completed a $95 million debt issue, the latest in a series of capital-
raising efforts for the struggling company.

Fairfax (NYSE,TSE:FFH) said it completed an offering of 7.75%
senior notes due 2012, at an issue price of 97.25%, in what the

group described as part of its "ongoing deleveraging efforts." As part of that effort, Fairfax also said it repurchased $15.5 million of 7.375% senior notes due 2006. "Fairfax intends to use the proceeds of the offering to continue to purchase its outstanding debt from time to time, based on market conditions," the group said in a statement.

94.     In connection with the issuance, on September 3, 2004 <u>A.M. Best</u> assigned a debt rating of bb+ to the offering of "7.75% senior unsecured notes due 2012 issued as part of its April debt exchange offer." Further, it stated "the outlook for all debt ratings remains negative."

95.     On September 29, 2004, the Company issued a terse statement that losses stemming from Hurricanes Ivan, Frances and Jeanne would be in the range of $85 million. The losses would be recorded within Fairfax's insurance and reinsurance companies, primarily Odyssey and Crum and Forster.

96.     Given the Company's heavily leveraged position and that it faced greater exposure, on October 28, 2004, it commenced steps to alter its capital structure without admitting that this was a necessary process to remain solvent and in the relative good graces of rating agencies, notwithstanding its efforts to achieve investment grade.

97.     In particular, the Company announced that in its bid to buy back debt, would issue US$300 million, or 2.4 million in subordinate voting shares to a number of institutional investors including Southeastern Asset Management and Markel Corp. (no relation to Fairfax subsidiary Markel Insurance Co.).

98.     Fairfax stated that the offering was part of its plan to purchase or redeem outstanding indebtedness, but may also be used for general corporate purposes. Commenting on the transaction. Mr. Watsa stated:

> Fairfax is raising significant equity at this time because of its high priority of improving its ratings and deleveraging significantly. A strong financial position with cash in excess of $600 million after this issue is the best way to handle uncertainty in our industry and

in the economy generally. So when Steven Markel, Vice Chairman of Markel Corporation, with one of the best insurance company track records, and Mason Hawkins, founding partner of Southeastern Asset Management, one of our largest shareholders with one of the best investment track records, offered to buy shares, we took advantage of the opportunity.

The significant flexibility that this equity issue provides the holding company, together with the disciplined underwriting operations that we have built, our runoff expertise and our investment acumen, will allow us to recoup the 5% dilution to book value quite easily.

99.     On October 29, 2004, the Company issued third quarter 2004 earnings that despite what it said was "excellent underwriting performance" during the third quarter, posted net loss of $108.9 million, or $8.08 a share.

100.    The Company convened a conference call with analysts later that day discussing the results and that the losses were caused by exposure to hurricanes.  Mr. Watsa placed a very positive spin on the results during the call:

Thank you, Trevor.   Just summing up then, insurance a and reinsurance operations with annualized net written premiums in excess of 4.5 billion – very disciplined underwriting company and continued to produce significant underwriting profits with combine ratios well below 100%.  Our investment portfolio in excess of 12 billion is very well positioned to take advantage of opportunities. Going forward, this will be more important than in the past, to make an adequate return for shareholders as we had mentioned to you in the past.   We have this expertise and the track record. Runoff continues to be extremely well managed by Dennis and his team, as Trevor has mentioned and we have mentioned in previous calls, we continue to simplify the organization and look to building a worldwide runoff organization, perhaps, without side partners. Finally, we have significantly deleveraged our company by issuing 300 million of equity to outstanding insurance and investment partners.  We have 600 million in cash, available for debt reduction and any contingency in the future.  Now, we are happy to answer your questions.  Please give us you name, your company name, and we appreciate it if you would limit your question to only one, so that all on the call have an opportunity to ask a question.  With that Michelle, I will pass it on to you.  We are ready for our questions.

101.    Fairfax's stock was up sharply the afternoon of Oct. 29, 2004, premised on this news, trading at $146.98 a share, up 17.91% from the previous close.

102.    On November 1, 2004, it was widely reported that TIG – one of its U.S. Subsidiaries – received a subpoena in connection with an industry wide investigation into brokers' commissions.    The *Globe* reported that Fairfax stated that it examined its payment practices and found no evidence of malfeasance.

103.    On November 3, 2004, the *Globe* and *Mail* published an article questioning the motives behind the Company sale of equity to two institutional investors and further questioned whether this was a below-market sale.

104.    According to the article, the Company sold $300 million of equity at $124.65 per share – roughly two thirds of book value for the Company at that time.

105.    On November 8, 2004, the Company hosted an investor conference in New York, attended by members of Company management – including Mr. Watsa.    Importantly, Mr. Watsa did not hesitate in criticizing the rating agencies:

> Our operating companies – the only point on the slide is to make the point to you that they are focused on underwriting and they have strong capitalization.    Each one of those companies when they present you'll see are very well capitalized – better than the rating capitalizations that the rating agencies have on each of those companies.

106.    On November 10, 2004, *Fitch* again reiterated its criticisms of the Company's financial position and leverage:

> Fitch Ratings commented today that Fairfax Financial Holdings Limited's (Fairfax) ratings and Rating Watch Negative status are unaffected by its recent disclosures via its third-quarter 2004 financial filings and investor conference held on Nov. 8, 2004. See below for a complete rating list.
>
> Fitch recognizes the positive credit implications afforded by Fairfax's forthcoming $300 million stock offering, which is

expected to increase holding company cash and investments to over $600 million, provide flexibility to further term out holding company debt maturities, and/or help offset unexpected costs/shortfalls in parental dividends/tax-sharing payments. Also, a recently proposed commutation of several reinsurance transactions will lessen the liquidity strain on Fairfax's subsidiary, nSpire Re Limited, and free up potentially needed intercompany reinsurance capacity.

However, Fitch continues to believe that Fairfax's long-term credit fundamentals remain weak and that management continues to face challenges with liquidity issues despite substantial funds generated via capital market access or realized gains in recent years, notably:

-- Financial leverage remains high; based on U.S. GAAP balance sheet adjustments, Fairfax's pro forma debt to total capital ratio is 45% at Sept. 30, 2004, including the proposed equity issuance;

-- Fixed-charge coverage as measured by EBIT-to-interest costs remains negative for the nine months ending Sept. 30, 2004;

-- Operating earnings remain unfavorable due in part to losses related to run-off operations. In the past few years, the primary source of earnings for Fairfax has been realized gains on invested assets, implying a low quality of reported earnings.

-- Reinsurance utilization and credit exposure to reinsurers is high, as recoverables were 277% of reported shareholders' equity at Sept. 30, 2004.

-- Deteriorating market pricing in the U.S. casualty segment may lead to a continued need to tap alternate sources to parental dividends and earnings retention to service subsidiary and holding company obligations.

-- Loss reserves have developed unfavorably in the past few years, and uncertainty remains regarding reserve adequacy.

-- Fairfax apparently is now unable to take advantage of its corporate credit facility due to stricter financial convents effective mid-2004

-- Based on Fairfax's competitive position in the U.S. market, Fitch believes the company is more vulnerable to commercial lines price softening and a shifting market preference toward higher rated insurers than peers.

Fitch also believes that a number of management actions, while providing short-term benefits, have further limited flexibility. Furthermore, the very need to take these actions is a reflection of the challenges management faces in maintaining organizational viability, including:

-- The change in provider of roughly $200 million of capital to Advent Capital (Holdings) PLC from nSpire Re to Odyssey Re Holdings Corp., which may have allowed for nSpire Re to fund Fairfax's indemnification of its runoff subsidiary TIG Insurance Company against losses related to Kingsmead;

-- Increased usage of intercompany guarantees that raises the potential liquidity requirements at Fairfax to fund either direct indemnifications or support subsidiary indemnifications;

-- Effective movement of letters of credit from Fairfax's secured corporate facility to a new secured facility that Fitch believes may provide inferior claims paying capacity, compared with its replacement, and raises concerns regarding the potential for 'double pledging' of assets effectively securing the facility;

-- Extensive utilization of internal and external income smoothing/capital enhancing financial reinsurance has negatively affected investment income and creates difficulty in understanding and interpreting financial results.

-- Sales of minority stakes in profitable operating segments have decreased available operating cash flow.

-- The company's investment strategy that has produced large reported realized investment gains, while enhancing capitalization of operating subsidiaries, has also diminished future investment income.

-- The proposed unwinding of sizable finite reinsurance agreements among TIG, nSpire Re, and outside parties may in part be prompted by a need to 'free up' capacity at nSpire Re to potentially absorb future loss reserve development among other Fairfax entities, such as Crum & Forster.

-- The sale of common stock below book value is highly unusual and may reflect a continued need to maintain significant holding company cash to offset unpredictable/limited parental cash flow from subsidiaries despite improvement in core operating earnings.

Fitch believes that Fairfax management has proven to be highly skilled in accessing the capital markets and executing transactions

to boost capital and meet liquidity challenges. However, following implementation of some of the actions above, management options to address future challenges are now fewer. Fitch believes that the uncertainty related to ongoing rating concerns such as loss reserve adequacy of Fairfax's growing runoff book of business may create additional funding requirements.

Furthermore, Fitch is concerned by what it perceives as a meaningful lack of public disclosures in regard to certain transactions, subsidiaries, reclassifications of prior year balance sheet, and footnote information. The complexity of Fairfax's organizational structure, and the nature and volume of intercompany transactions adds to the challenges in completing a credit analysis of the organization.

Specifically, Fairfax's ownership of its operating subsidiaries winds through several intermediate holding companies, located in various countries, and the ownership chain has been altered several times in the past few years. These intermediate holding companies have been involved in various transactions over time, including internal financing, intercompany reinsurance, and guaranty arrangements that have not always been fully disclosed, and the rationale for some of these transactions is not always apparent.

Fitch will consider Fairfax's Rating Watch following the completion of the proposed common stock offering and reinsurance commutations and after a review of year-end results and disclosures by Fairfax. Fitch remains concerned by the level and quality of public disclosures by the company and will consider withdrawing the ratings if it is determined that the company's year-end 2004 disclosures do not allow for a reasonable assessment of the level or direction of Fairfax's credit worthiness.

Fitch's ratings of Fairfax are based primarily on public information.

107.    On December 3, 2004, The Company announced that it had sold another piece of debt:

Fairfax Financial Holdings Ltd. has sold $200-million of its 7-3/4-per-cent senior notes, due 2012, at an issue price of 99 per cent. Fairfax intends to use the proceeds from this offering to purchase the $112-million of debt tendered to date pursuant to its debt tender offer announced on Nov. 18, 2004, and to purchase other outstanding debt, including the 45.7-million-euro vendor note due in 2007.

All dollar amounts in this press release are expressed in United States dollars.

108.    Mr. Watsa stated in connection with the transaction:

Our financing goals for 2004 were to significantly deleverage our balance sheet, remove refinancing risk and maintain significant cash at the holding company. When we close this debt issue, our equity financing announced on Oct. 28, 2004 (which is subject to regulatory approval), and our debt tender offer, I believe we will have clearly met these goals:

We will have meaningfully delevered by issuing $300-million of new equity.

After purchasing the debt currently tendered to our debt tender offer and retiring the remaining $27.5-million of debt maturing in April, 2005, we will have retired $409.7-million (or 75 per cent) of our 2005, 2006 and 2008 debt maturities since Jan. 1, 2004.

With our holding company cash (approximately $325-million at Sept. 30, 2004), and the approximately $300-million proceeds of our equity offering, we will have effectively removed refinancing risk until 2012 while maintaining very significant cash at the holding company.

109.    On February 10, 2005, the Company reported fourth quarter and year-end 2005 results. The results reflected lower profits for the fourth quarter stemming from realized losses and the repurchase of outstanding debt and the placements of other reserves at subsidiaries namely Crum & Forster. Quarterly revenues also declined over the prior period.

110.    The Company convened a conference call on February 11, 2005 to discuss the results during which Mr. Watsa touted the Company's financial strength:

Finally we strengthened our financial position in 2004. We ended the year with cash and marketable securities of approximately 567 million. We issued 300 million of equity as you know, and through debt issues and exchange offers we began to deleverage our balance sheet and extend the term of our debt to 2012. We issued 466 million of investment-grade debt due in 2012 during the year 2004. Common shareholders equity increased to $3 billion form 2.7 billion in 2003. With everything included book value per share went down approximately 4 percent to $185 per share form

31

$193 last year due to the issue of 2.4 million shares below book value.  As I said in the third-quarter call our strong financial position will help us to more than make up in the future.  Now I'd like to turn it over to Trevor to he can give you some more information on the underlying financials.  Trevor.

*     *     *

In terms of maintaining a strong financial position, we have as we have said in the past, a significant cash buffer at the holding company and we plan on reducing our financial leverage in the next few years.  The combination of profitability and our strong financial position should result in our ratings improving which is a very important focus for Fairfax.  So in summary we are very excited about the prospects for our company in 2005 with excellent underwriting and investment capability that should serve our shareholders well over the long term.

111.    On March 4, 2005, Fairfax issued a press release announcing that it has filed its 2004 annual report.  In addition, the Company proudly proclaimed it was compliant with those governance practices deemed standard under the securities laws:

**FAIRFAX ISSUES CLEAN REPORT ON
INTERNAL CONTROL**

Fairfax Financial Holdings Limited (TSX:FFH.SV) (NYSE:FFH) announces that its 2004 Annual Report, released today, includes a report by management concluding that the company's internal control over financial reporting was effective as of December 31, 2004, and an opinion by Fairfax's independent auditors to the same effect.  Neither management's report nor the auditor's opinion identified any material weakness in internal controls over financial reporting.

As a non-U.S. company, Fairfax is not currently required under the Sarbanes-Oxley Act to undertake an assessment of the effectiveness of its internal control over financial reporting or to obtain its independent auditors' opinion thereon.  Fairfax voluntarily elected to do so, two years ahead of its compliance deadline, in order to assess for itself the integrity and quality of its internal control over financial reporting and to provide shareholders and debtholders with the greatest assurance of the effectiveness of its internal control over financial reporting.

112.    On March 31, 2005, Fairfax released its annual report for the year ended December 31, 2004 on Form 40-F that stated in pertinent part:

> 2004 was the second year in our 19-year history that we lost money, due to unprecedented hurricane activity, reduced investment income as a result of our very conservative investment position, and runoff losses. We lost 1.0% on average shareholders' equity in 2004 (compared to a return on equity of about 15.5% for the S&P 500 and 12. 7% for the S&P/TSX). We had a loss of $17.8 million (all dollar amounts in this letter in U.S. dollars unless stated otherwise) or $2.16 per share in 20904 compared to a profit of $271.1 million or $18.55 per share in 2003. For the second time in our history, book value per share decreased, by 4.1% to $184.86 per share, due to the loss in 2004 and a share issue below book value, while our share price dropped 3.4% to $168.50 from $174.51 at year end 2003. Intrinsic value, however, increased significantly in 2004 because of the excellent performance of our ongoing insurance and reinsurance companies. In spite of 2004, over the past 19 years, we have compounded book value by 28.7% from $1.52 per share to $184.86 per share and stock prices have followed from $2.38 to $168.50, a compound rate of 25.1% per year.

113.    Despite these losses, the company endorsed its business outlook.

> While our returns left much to be desired in 2004, we made significant progress in achieving the second and third objectives in our guiding principles that we have reproduced in Appendix A. As you will see later, our financial position was significantly strengthened during 2004 and we have taken a big step forward to make it easier for you to understand our company by disclosing segmented balance sheets as well as income statements.

> As shown, in spite of the hurricanes and our cautious investment strategy, Northbridge and Odyssey made good returns on equity. Crum & Forster (U.S. Insurance), because of the hurricanes, made only a modest return. Runoff lost significant money because of operating costs in excess investment income as well as some reserve development and commutation losses. Lindsey Morden lost money due to writeoffs on the sale of its TPA business and the significant interest costs at the Lindsey Morden holding company. We expect our ongoing operations to continue to do well and Lindsey Morden to extend the profitability that begun in the fourth quarter, while at our runoff operations we are seeking to reduce our losses and become profitable. We are also focused on reducing our corporate and other expenses, including interest expense.