**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

KENNETH PARKS And WILLIAM SEYMOUR, :
On Behalf Of Themselves And All :
Others Similarly Situated, :

        v. :

FAIRFAX FINANCIAL HOLDINGS :
LIMITED, et al., :

Master File No.
06 CV 2820 (GBD)

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (JE-5503)
Geoffrey C. Jarvis (GJ-3986)
Charles Caliendo (CC-6069)
45 Rockefeller Center
630 Fifth Avenue
New York, New York 10111
Tel:    (646) 722-8500
Fax:    (646) 722-8501

-and-

**GRANT & EISENHOFER P.A.**
Sharan Nirmul (SN 2075)
Naumon A. Amjed
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Tel:    (302) 622-7000
Fax:    (302) 622-7100

*Lead Counsel for the Class*





# TABLE OF CONTENTS

Page

I.      OVERVIEW OF CLAIMS ................................................................................2

II.     PARTIES ........................................................................................................8

III.    GROUP PLEADING ....................................................................................15

IV.     CONFIDENTIAL WITNESSES ..................................................................17

V.      JURISDICTION AND VENUE ...................................................................19

VI.     CLASS ACTION ALLEGATIONS .............................................................24

VII.    HISTORY AND BACKGROUND OF FAIRFAX .......................................26

        A.      Fairfax Expands Through Acquisitions ...............................................26

        B.      The Acquisition of TIG And Crum & Forster .....................................27

        C.      Watsa Tries To Raise Money For Fairfax To Meet Regulator's Liquidity
                Requirements .......................................................................................31

VIII.   THE FRAUDULENT SCHEME TO INFLATE FAIRFAX'S FINANCIALS ...............33

        A.      Fairfax's Improper Use Of Finite Reinsurance To Boost Reserves ......................34

                1.      Retroactive Reinsurance Accounting Differences Between
                        Canadian And US GAAP .........................................................40

                2.      Improper Reinsurance Accounting At OdysseyRe ....................................41

        B.      Fairfax Never Adopted Procedures To Test for Risk Transfer And Was
                Devoid Of Internal Controls ................................................................43

                1.      Confidential Witnesses Confirm That Fairfax's Lack Of Internal
                        Controls Was A Long Standing and Well-Known Problem ......................46

        C.      Fairfax Uses Other Gimmicks To Artificially Inflate The Value Of Its
                Assets ..................................................................................................50

                1.      Fairfax Uses Off-Shore Entities To Manipulate Its Investment
                        Income ....................................................................................50

                2.      Fairfax Overstated Shareholder Equity In 2004 And 2005 By $28.4
                        Million And Understated Losses By Failing To Properly Record Its
                        Investment In Zenith National Investment Corp. .....................................52

|  |  | 3. | Fairfax Fails To Properly Account for Investments In Convertible Bonds And Other Fixed Income Securities | 53 |

|  | D. | Erroneous Accounting For Intercompany Transactions That Boosted Shareholder Equity | 54 |

|  | E. | Fairfax's Accounting Tricks Have Their Intended Effect | 60 |

|  | F. | Fairfax Denies Wrongdoing In The Face of Regulatory Probes | 62 |

|  | G. | The Truth Begins To Emerge: The March 22, 2006 Press Release | 66 |

| IX. | | FAIRFAX's RESTATEMENT REVEALS THAT ITS FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS | 69 |

|  | A. | Fairfax's Financial Statements Failed To Comply with Basic GAAP Principles | 69 |

|  | B. | Fairfax's Public Filings Violated SEC Regulations By Failing To Include Information Necessary To Make Fairfax's Public Filings Not Misleading | 73 |

|  | C. | Fairfax's Restatements | 76 |

| X. | | THE DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD | 79 |

| XI. | | SCIENTER | 167 |

|  | A. | The Officer Defendants' Conscious Misbehavior | 167 |

|  |  | 1. | V. Prem Watsa | 169 |

|  |  | 2. | Trevor Ambridge | 172 |

|  | B. | The Officer Defendants Had Motive And Opportunity To Falsify Fairfax's Financial Performance | 173 |

|  | C. | OdysseyRe's Scienter | 175 |

|  | D. | PWC's Scienter | 177 |

|  |  | 1. | Numerous "Red Flags" Should Have Alerted PWC to Fairfax's Materially False and Misleading Financial Statements | 183 |

|  |  | 2. | PWC either Deliberately Ignored or Was Reckless in Ignoring Red Flags Because Its Audits Were Not Performed In Accordance With GAAS | 191 |

|  |  | 3. | PWC Failed to Adequately Plan Its Audit | 192 |

      4.     PWC Failed to Obtain Sufficient Competent Evidential Matter ............. 199

      5.     PWC Improperly Issued Unqualified Audit Reports............................... 202

      6.     PWC Improperly Issued an Unqualified on the Effectiveness of the
             Company's Internal Controls over Financial Reporting ........................... 203

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD
       ON THE MARKET....................................................................................................... 208

XIII.  LOSS CAUSATION ALLEGATIONS........................................................................ 209

XIV.  CLAIMS FOR RELIEF ............................................................................................... 215

XV.   PRAYER FOR RELIEF ............................................................................................... 227

XVI.  JURY DEMAND.......................................................................................................... 228

Lead Plaintiff, CI Canadian Small/Mid Cap Fund; CI Canadian Asset Allocation Fund; CI Canadian Investment Fund; CI Canadian Investment Corporate Class; Synergy Canadian Style Management Corporate Class; Synergy Tactical Asset Allocation Fund; Skylon High Yield Trust; High Yield & Mortgage Plus Fund; DDJ High Yield Fund; and DDJ U.S. High Yield Trust (collectively, the "CI Funds"), on behalf of itself and all other purchasers of Fairfax Financial Holdings Limited ("Fairfax" or the "Company") securities between and including May 21, 2003 and March 22, 2006 (the "Class Period"), alleges the following upon information and belief, except as to those allegations concerning the CI Funds, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, among other things:  (a) an investigation conducted by and through its attorneys that included, but was not limited to, interviews with former employees of Fairfax, Fairfax's subsidiaries and companies affiliated with and doing business with Fairfax; (b) review and analysis of filings made by Fairfax with the Securities and Exchange Commission ("SEC"); (c) review and analysis of SEC filings made by companies affiliated with Fairfax such as Crum & Forster and OdysseyRe Holdings Corp., among others; (d) the complaints and other documents filed in *Spyro C. Contogouris, et al., v. PricewaterhouseCoopers, LLP, et al.*, No. 06-9668 (E.D. La.) and *Fairfax Financial Holdings Limited, et al., v. S.A.C. Capital Management, LLC, et al., No.* L-002032-06 (N.J. Super. Ct. Law. Div.), as well as, papers filed in *Fairfax Financial Holdings Limited, et al., v. S.A.C. Capital Management, LLC, et al.,* No. 06-4197 (D.N.J.); (e) press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Fairfax, Fairfax's subsidiaries and/or the other defendants; and (f) other publicly available information about Fairfax, Fairfax's subsidiaries and/or the other defendants.  Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations after a

reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are within their control.

## I.    OVERVIEW OF CLAIMS

1.    Fairfax has defrauded investors by inflating the value of its assets and concealing its lack of liquidity over the course of several years through, *inter alia*: fraudulently accounting for reinsurance contracts which were, in essence, loans by, among other things, failing to employ adequate risk transfer tests to determine if reinsurance contracts qualified for "reinsurance" rather than "deposit" accounting; maintaining ineffective controls while assuring investors that the Company's controls were effective; using privately held foreign assets domiciled in jurisdictions with lax oversight to permit the Company to manipulate its investment income; failing to properly account for losses in companies that should have been consolidated with Fairfax; improperly accounting for intercompany transactions; and using "investments" to funnel money to cash strapped subsidiaries. Faced with a tightening noose of investigations by federal and state authorities, Fairfax has attempted to white-wash its financial statements of any traces of its improper and illegal financial trickery. In the process, it has haltingly revealed through a series of three restatements that it has inflated shareholder equity by at least 15% on a year to year basis since at least 2003.

2.    Fairfax's fraud has only recently come to light. In November 2004, the SEC and the former Attorney General for the State of New York, Elliot Spitzer, began an inquiry into the use of so-called "finite reinsurance" contracts (although there are various types of finite reinsurance contracts generally, finite reinsurance contracts are reinsurance contracts through which risk is transferred to the reinsurer, but with risk transfer usually being limited in some way) by major insurers and reinsurers to manage their earnings and assets.

3.     Although Fairfax's subsidiaries, and then the Company itself, was swept up in the investigation, the Company repeatedly denied any wrongdoing.

4.     Despite Fairfax's denials of any wrongdoing, in February 2006, OdysseyRe, Fairfax's largest subsidiary, announced that it was restating financial results from fiscal year 2001 through the first nine months of 2005 to correct errors related to finite reinsurance contracts.  At the time of this announcement, V. Prem Watsa ("Watsa"), Fairfax's Chairman and Chief Executive Officer, flatly denied that Fairfax had improperly used finite reinsurance contracts at the parent level.

5.     In March 2006, Fairfax revealed that Watsa's February statements were blatantly false.  In fact, Fairfax not only revealed that the SEC had subpoenaed records of all of Fairfax's finite reinsurance contracts in the previous year, more shockingly, the Company revealed that the SEC had subpoenaed Watsa personally in connection with his February 2006 denials of Fairfax's use of finite reinsurance contracts.  Fairfax's March 2006 announcement also disclosed that the Company's auditor, PricewaterhouseCoopers LLP ("PWC") received a subpoena from the SEC in the United States and letter requesting cooperation in Canada.  Fairfax's stock collapsed in response to these disclosures, but Watsa and Fairfax sought to reassure the market, going so far as to blame short-sellers of the Company's stock for the collapse of Fairfax's stock price.  Indeed, on July 26, 2006, Fairfax filed a five billion dollar law suit in the Superior Court of New Jersey Law Division: Morris County, against certain analysts and hedge-funds accusing them of conspiring to spread false rumors about Fairfax's financial strength.  The short-seller defendants subsequently removed the case to the U.S. District Court for District of New Jersey.

6.     Months after learning of the SEC subpoenas, investors were given more bad news.  On July 29, 2006, Fairfax revealed that the Company would have to restate its financials

3

going back to 2001. According to Watsa this "very embarrassing" development was related to the Company's commutation—or cancellation—of a finite reinsurance contract with Swiss Re and would impact shareholder equity by $175 million to $190 million.

7.    In fact, the restatement, when it was finally completed in November 2006, was more than just embarrassing to Fairfax. It revealed that the Company was utterly without internal controls, contrary to what it—and its auditors—had specifically opined on just eight months earlier. Even more scathing was that, contrary to Watsa's assurances, Fairfax had indeed been improperly accounting for finite reinsurance contracts and other intercompany transactions. In stark contrast to Watsa's earlier estimate of the magnitude of Fairfax's restatement, its effect was to reduce shareholder equity--or the net value of Fairfax's assets--by more than $400 million for fiscal years 2003 through 2005. The restatement amounts to a 15-20% decrease in shareholder equity in each of these years.

8.    With respect to the Company's accounting for finite reinsurance contracts, Fairfax's restatement admitted, "[f]ollowing an internal review, it was determined that the information currently available is *insufficient to support reinsurance accounting*. The company has restated the accounting for the contracts to apply the deposit method of accounting rather than reinsurance accounting." (emphasis added). As explained below, under AICPA Accounting Standards Executive Committee Statement of Position "SOP" 98-7, "deposit accounting" is applied to insurance and reinsurance contracts that do not transfer insurance risk. Fairfax's mea culpa under the guise of a restatement stemming from the commutation of a reinsurance contract does not change the fact that throughout the Class Period Fairfax misrepresented its financial appearance by, *inter alia*, improperly accounting for reinsurance contracts which did not transfer risk as reinsurance. Under the accounting rules, Fairfax should

have accounted for these reinsurance contracts as debt rather than reinsurance. Fairfax's restatement admits that the Company improperly accounted for these contracts and when the truth was revealed, Fairfax restated shareholder equity by 15-20%.

9.    While the Company maintains that its need for a restatement was unexpected, confidential witnesses interviewed by Lead Plaintiff reveal that Fairfax's restatement did not come as a surprise to Fairfax's employees. As well as detailing the rampant internal control deficiencies that existed for years throughout Fairfax, these confidential sources confirm that Watsa had a hand in every aspect of the Company's operations. Moreover, at OdysseyRe, according to a confidential witness, there were no procedures to assess whether finite reinsurance contracts met the necessary prerequisites for risk transfer – a critical component in determining whether reinsurance contracts receive "reinsurance" as opposed to "deposit" accounting treatment. Thus, Fairfax was utilizing reinsurance accounting knowing that it could not justify the application of this accounting treatment.

10.    In addition to abusing finite reinsurance contracts, Fairfax engaged in a number of other deceptive acts to conceal its true financial appearance.

11.    First, Fairfax manipulated investment income to mask its poor financial performance. Specifically, in the aftermath of the devastating 2005 hurricane season (which included Hurricanes Katrina and Rita), the Company reported a $498 million loss. Miraculously, however, Fairfax reported that its investment profits added $402 million to its bottom line that very year. But these "investment profits" came mostly from foreign privately held investments whose values were determined by Fairfax. Thus, by using these manufactured, phantom "gains" from unlisted foreign investments, Fairfax was able to mask the impact of the disastrous hurricanes of 2005.

5

12.    Second, Fairfax simply ignored reporting losses associated with investments that should have been consolidated with the Company's financial results.    As admitted in the Company's restatement, Fairfax was obligated to consolidate $30.9 million in losses from its investment in Zenith National Investment Corp. between 1999 and 2001.    When the proper adjustments were made -- in 2006 -- shareholder equity was decreased by $11.6 million and $16.8 million as of September 30, 2005 and December 31, 2004, respectively.

13.    Third, the Company erroneously accounted for various intercompany transactions by: incorrectly eliminating gains and losses on intercompany purchases and sales of portfolio investments;   writing-off   unreconciled   intercompany   balances;   incorrectly   eliminating intercompany advances and related foreign currency accounting; and failing to reduce receivables when cash was collected by subsidiaries.    Moreover, as reported by confidential witnesses, Fairfax "shifted" money to its subsidiaries through "investments" when the subsidiaries needed infusions of cash.

14.    Finally, the Company's internal controls – which were repeatedly touted to investors as effective – were a complete failure and provided no effective means to communicate the Company's true financial appearance to investors.    Various confidential witnesses have come forward with information revealing that management (and specifically Watsa) was made aware of Fairfax's (and/or its subsidiaries') ineffective controls long before the Company's restatement in 2006.    Indeed, one witness reported that she wrote a report on the state of OdysseyRe's controls.    According to this witness, the report, which was given to top Fairfax executives – including Watsa, determined that, as part of a pass/fail audit, OdysseyRe's controls were a "fail." OdysseyRe's controls received a failing grade because, according to this witness, the company took six months to close its books, employees were forced to hand calculate OdysseyRe's

financials, there were no processes in place to track bids (so OdysseyRe's employees were bidding against one another for the same projects), employees signed their own expense checks and forecasting was based on "total guesswork."

15.    Even though the market began correcting the inflation in Fairfax's shares caused by the Company's various schemes to hide its true financial condition in June 2005, investors only fully learned of the severity of the Company's schemes on March 22, 2006, after Fairfax issued a "Subpoena Update" announcing that the SEC was looking into statements made by Watsa during a February 2006 conference call with analysts.

16.    As the layers of lies and deception were peeled away, the Company's investors lost millions as the price of Fairfax's securities declined as pieces of the Defendants' scheme was disclosed to the market beginning in June 2005.  On June 24, 2005, Fairfax issued a press release stating that Fairmont received a subpoena from the SEC demanding documents regarding any non-traditional insurance product transactions entered into by Fairmont.  On September 7, 2005, Fairfax issued a press release stating that the Company received another subpoena from the SEC regarding its use of non-traditional insurance products.

17.    On October 10, 2005, several news articles reported that the Justice Department had joined the SEC's investigation of Fairfax.  In response, Fairfax's shares fell from $168.17 on October 7, 2005, to close at $149.00 on the following trading day (October 10, 2005), a decline of 11.4%.  After initially denying that the Company received a subpoena from the Justice Department (on October 10, 2005), the following day, Fairfax issued a "clarification," in which Fairfax now stated the Justice Department would review documents produced to the SEC.

18.    Finally, the price of Fairfax's shares collapsed in response to the Company's March 22, 2006 disclosures, suffering its biggest single day decline in approximately three years,

falling from $130.90 to $113.93 per share, representing a decline in market capitalization of approximately $300 million, or approximately 13% of its value.

19.     After the March 22nd press release, Fairfax securities continued to trade well below their Class Period value as more bad news flooded the market. Specifically, the Company delayed the filing of its annual report, OdysseyRe – one of Fairfax's largest subsidiaries -- announced the need to restate its own financial reports for, *inter alia*, improperly accounting for finite reinsurance contracts, and Fairfax restated its own financial reports a few days after the Company filed a lawsuit against short-sellers for allegedly manipulating the price of its securities. Between the end of the Class Period and June 19, 2006, Fairfax's shares closed at an average price of $115.

## II.     PARTIES

20.     Lead Plaintiff, the CI Funds, are part of a family of affiliated open-ended or closed-ended investment funds managed and distributed by CI Investments, Inc. ("CII"). CII is Canada's third largest investment fund company. Currently, the assets in the funds managed by CII and its affiliates exceed $63 billion (CAD).[1]   During the Class Period, the CI Funds purchased Fairfax securities that were artificially inflated by the Defendants' conduct as detailed herein. The CI Funds suffered losses as a result of their purchases of Fairfax's securities when part of the Defendants' fraud was revealed. By Order dated August 28, 2006, the Court appointed the CI Funds to serve as Lead Plaintiff for the Class.

21.     Defendant Fairfax is a financial services holding company which, through its subsidiaries, is engaged in property and casualty insurance and reinsurance, investment management and insurance claims management. The Company is a Canadian corporation with

---

[1] Amounts in Canadian Dollars are identified as "C$__," "CAD," "Cdn" or "CND." All other amounts are in US Dollars.

its principal executive offices located at 95 Wellington Street West, Suite 800, Toronto, Ontario Canada M5J 2N7.  Fairfax's subordinate voting shares are traded on the New York and Toronto stock exchanges.  Fairfax's common stock is listed on the Toronto Stock Exchange under the symbol "FFH.SV" and the New York Stock Exchange under the symbol "FFH."  In addition to OdysseyRe (discussed below), Fairfax's principal subsidiaries include:

      a.      Northbridge Financial—based in Toronto, Northbridge Financial provides property and casualty insurance products through its Commonwealth, Federated, Lombard and Markel subsidiaries, primarily in the Canadian market as well as in selected U.S. and international markets. In 2005, Northbridge's net premiums written were Cdn$1,188.5 million. At the end of 2005, the company had capital of Cdn$1,026.8 million and there were 1,573 employees;

      b.      Falcon Insurance--based in Hong Kong, Falcon Insurance writes property and casualty insurance to niche markets in Hong Kong. In 2005, Falcon's net premiums written were HK$231.7 million.[2]  At the end of 2005, the company had capital and surplus of HK$274.2 million and there were 116 employees;

      c.      First Capital--based in Singapore, First Capital writes property and casualty insurance primarily to Singapore markets. In 2005, First Capital's net premiums written were SGD27.8 million.[3]  At the end of 2005, the company had capital and surplus of SGD74.4 million and there were 33 employees;

---

[2] "HK" refers to the Hong Kong Dollar.

d.   The U.S. runoff group - The U.S. runoff group consists of the company resulting from the December 2002 merger of TIG and International Insurance;

e.   The European runoff group - The European runoff group consists of RiverStone Holdings and Dublin, Ireland-based nSpire Re;

f.   The Resolution Group (TRG)/RiverStone Group - The Resolution Group (TRG) and the RiverStone Group (run by TRG management) manage the U.S. and the European runoff groups. TRG/RiverStone has 411 employees in the U.S., located primarily in Manchester, New Hampshire and Dallas, and 136 in its offices in the United Kingdom;

g.   Group Re - Group Re primarily constitutes the participation by CRC (Bermuda), Wentworth (based in Barbados) and nSpire Re in the reinsurance programs of Fairfax's subsidiaries, by quota share or through participation in those subsidiaries' third party reinsurance programs, on the same terms as the third party reinsurers.  In 2005, its net premiums written were $326.5 million;

h.   Cunningham Lindsey Group Inc. - Cunningham Lindsey Group Inc. provides a wide range of independent insurance claims services, including claims adjusting, appraisal and claims and risk management services, through a worldwide network of branches in Canada, the United States, the United Kingdom, continental Europe, the Far East, Latin America and

---

[3] "SGD" refers to the Singapore Dollar.

the Middle East.  In 2005, revenue totaled Cdn$432.2 million. At the end of 2005, the group had 3,627 employees located in 289 offices;

i.   MFXchange – MFXchange ("MFX") was established in 2002 and is based in Parsippany, New Jersey with offices in Toronto, Dallas and Ireland. MFX designs, creates and markets a full range of state of the art technology products and services for the insurance industry, including the insurance, reinsurance and runoff subsidiaries of Fairfax;

j.   Hamblin Watsa Investment Counsel ("Hamblin Watsa") - Hamblin Watsa was founded in 1984 and provides investment management to the insurance, reinsurance and runoff subsidiaries of Fairfax; and

k.   Crum & Forster ("C&F") is a wholly owned, indirect subsidiary of Fairfax.  C&F is organized under the laws of Delaware and it maintains its principal place of business in Morristown, New Jersey.  C&F is a national commercial property and casualty insurance company in the United States writing a broad range of commercial coverage.  Its subsidiary Seneca Insurance provides property and casualty insurance to small businesses and certain specialty coverages.  Since January 1, 2006, the specialty niche property and casualty and accident and health insurance business formerly carried on by Fairmont Insurance is being carried on as the Fairmont Specialty division at C&F.  In 2005, C&F's net premiums written were $866.9 million.

22.   The bulk of Fairfax's operating assets are located within the United States and the Company readily admits its reliance on the United States to drive its business.  *See* Fairfax's

2003 Annual Report at 49 ("the majority of the company's operations are in the United States or conducted in U.S. dollars...."). *See also* Fairfax's Prospectus filed with the SEC on Form F-10 on March 23, 2004 at 1 ("The United States is our largest market, accounting for 56.0% of net premiums earned for the year ended December 31, 2003....").

23. Defendant OdysseyRe Holdings Corp. ("OdysseyRe") is a Delaware corporation with its principal offices located at 300 First Stamford Place, Stamford, Connecticut, 06902. OdysseyRe underwrites treaty and facultative reinsurance as well as specialty insurance business, with principal locations in the United States, Toronto, London, Paris, Singapore and Latin America. In 2005, OdysseyRe's net premiums written were $2,314.1 million. Prior to the completion of OdysseyRe's initial public offering in June 2001, OdysseyRe was wholly owned by Fairfax. As of December 31, 2005, Fairfax owned 80.2% of OdysseyRe's common shares. During the Class Period, OdysseyRe's financial results were consolidated with those of Fairfax and reported in Fairfax's periodic financial reports. In November 2006, Fairfax and OdysseyRe announced that Fairfax would sell 9 million shares of OdysseyRe in a secondary offering. Upon the completion of the recently announced offering, Fairfax will continue to own a majority of OdysseyRe's shares. OdysseyRe's common stock is traded on the NYSE under the symbol "ORH". In addition to Watsa, who is the Chairman of OdysseyRe, Bennett, Griffiths, Hartog and Sweitzer all served as OdysseyRe board members in 2005.

24. Defendant V. Prem Watsa ("Watsa") is the founder of Fairfax and continues to serve as the Company's Chief Executive Officer and Chairman. Watsa also serves as the Chairman of OdysseyRe, as well as, the vice president of Hamblin Watsa, the chairman of Northbridge, C&F, and Lindsey Morden Group Inc. According to Fairfax's Management Proxy

Circular (dated March 31, 2006), Watsa holds slightly less than a majority of the total votes

attached to all of Fairfax's shares:

> The Sixty Two Investment Company Limited ("Sixty Two")
> owns 50,620 subordinate voting shares and 1,548,000 multiple
> voting shares, representing 47.6% of the total votes attached to all
> classes of our shares (100% of the total votes attached to the
> multiple voting shares and 0.3% of the total votes attached to the
> subordinate voting shares). V. Prem Watsa, our Chairman and a
> director, controls Sixty Two and himself beneficially owns an
> additional 255,552 subordinate voting shares and exercises control
> or direction over an additional 2,100 subordinate voting shares.
> These shares, together with the shares owned directly by Sixty
> Two, represent 48.4% of the total votes attached to all classes of
> our shares (100% of the total votes attached to the multiple voting
> shares and 1.8% of the total votes attached to the subordinate
> voting shares). To the knowledge of our directors and officers,
> there are no other persons who beneficially own (directly or
> indirectly) or exercise control or direction over more than 10% of
> the votes attached to any class of our shares....

During the Class Period, Watsa signed false and misleading SEC filings and knowingly issued

false statements about Fairfax's (and its subsidiaries') financial health.

25.    Defendant Trevor J. Ambridge ("Ambridge") was, until May 13, 2005, the

Company's Chief Financial Officer ("CFO"). During the Class Period, Ambridge signed false

and misleading SEC filings and knowingly issued false statements about Fairfax's (and its

subsidiaries') financial health.

26.    Defendant Greg Taylor ("Taylor") was appointed to succeed Ambridge as

Fairfax's CFO on May 13, 2005. During the Class Period, Taylor signed false and misleading

SEC filings and knowingly issued false statements about Fairfax's (and its subsidiaries')

financial health. Prior to serving as Fairfax's CFO, Taylor worked as Northbridge's CFO.

27.    Defendant M. Jane Williamson ("Williamson") was, at all relevant times, the

Company's Vice President and Chief Accounting Officer. During the Class Period, Williamson

signed SEC filings that contained false and misleading statements.

28.     Defendant Robert Hartog ("Hartog") was, at all relevant times, the Company's director and served on the Company's audit committee. During the Class Period Hartog signed SEC filings that contained false and misleading statements.

29.     Defendant Anthony F. Griffiths ("Griffiths") served on the Company's audit committee during the Class Period and signed SEC filings that contained false and misleading statements.

30.     Defendant Bradley P. Martin ("Martin") was, at all relevant times, the Company's Vice President and Corporate Secretary. During the Class Period, Martin signed SEC filings that contained false and misleading statements.

31.     Defendant Brandon Sweitzer ("Sweitzer") serves on the Company's governance, nominating and compensation committees. During the Class Period, Sweitzer signed SEC filings that contained false and misleading statements.

32.     Defendants Watsa, Ambridge, and Taylor are referred to hereinafter as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Fairfax's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Officer Defendants are

liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

33.    Defendant PricewaterhouseCoopers LLP ("PWC") has served as Fairfax's auditor since 1974.  PWC consistently issued "clean audit" opinions for Fairfax's financial reports throughout the Class Period.  On March 22, 2006, Fairfax issued a press release stating that PWC received a subpoena from the SEC in the United States and a letter requesting cooperation in Canada.

34.    Fairfax, OdysseyRe, the Officer Defendants, Williamson, Hartog, Griffiths, Martin, Sweitzer and PWC are collectively referred to herein as the "Defendants."

III.    GROUP PLEADING

35.    As officers, directors, and/or controlling persons of a publicly-held company whose securities trade on the NYSE, and governed by the provisions of the federal securities laws, each of the Officer Defendants had a duty to promptly disseminate accurate and truthful information with respect to the financial reporting and the publicly-reported quarterly and annual results of operations of Fairfax, so that the market price of the Company's publicly-traded securities would be based upon truthful, accurate and complete information.

36.    The Officer Defendants are liable for the materially false and misleading statements and omissions of material fact in Fairfax's SEC filings and press releases as such statements represent "group-published" information, disseminated to the public as a result of their collective action. It is appropriate to treat the Officer Defendants as a group and to presume that the false and misleading information conveyed in the public filings, press releases and other publications, as alleged herein, are the collective actions of this narrowly defined group of defendants.  By virtue of their high-level positions within Fairfax, the Officer Defendants directly participated in the management of the Company, were directly involved with the day-to-

day operations and were privy to confidential non-public information concerning the operations of Fairfax, as alleged herein. The Officer Defendants were involved in drafting, reviewing and/or disseminating the false and misleading financial statements that were issued by Fairfax, approved or ratified these statements and, therefore, adopted them as their own.

37. By reason of their positions with the Company, the Officer Defendants attended management and/or board of directors meetings, and had access to internal Company documents, reports and other information, including adverse non-public information regarding Fairfax's business, operations, products and future prospects, and including non-public information concerning its use of and accounting for finite reinsurance contracts as well as the effectiveness of the Company's internal controls. In addition, pursuant to Section 302 of the Sarbanes-Oxley Act, 15 U.S.C. § 7241, the Officer Defendants, during the Class Period, were required to certify the accuracy of Fairfax's financial reporting and designing, evaluating, and reporting on the effectiveness of, internal controls at Fairfax. The Officer Defendants are therefore responsible for the truthfulness and accuracy of the Company's public reports, SEC filings and press releases referred to in this Complaint.

38. The Officer Defendants were responsible for the truthfulness and accuracy of the Company's public statements regarding: (1) use of and accounting for finite reinsurance contracts; and (2) Fairfax's internal controls. Each of the Officer Defendants signed many of the Company's Class Period SEC filings, as more fully described herein, and certain of these SEC filings contained certifications by the Officer Defendants attesting to the effectiveness and adequacy of the Company's internal controls. Based upon such signed certifications, the Officer Defendants are responsible for the truthfulness and accuracy of Fairfax's public reports, press releases and other statements concerning, among other things, the Company's use of and

16

accounting for finite reinsurance and the Company's financial results, as detailed herein. Accordingly, the Officer Defendants are primarily liable for the materially false and misleading representations and omissions of material facts contained within these statements.

39.     The Officer Defendants participated in preparing and/or approving the public reports and other statements and communications described above and discussed more fully herein. Each of the Officer Defendants knew or recklessly disregarded the fact that the false and misleading statements and omissions complained of herein would adversely affect the integrity of the market for Fairfax's stock, and would cause the price of Fairfax's common stock to become artificially inflated. Each of the Officer Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Lead Plaintiff and the Class.

## IV.    CONFIDENTIAL WITNESSES

40.     Several former employees of Fairfax and its subsidiaries have provided Lead Plaintiff and its attorneys with information concerning the Defendants' fraudulent scheme and misrepresentations.   These witnesses gave information on a confidential basis, and each is designated as "CW__," as stated below.

41.     CW1 worked as an investment advisor at OdysseyRe between 2000 and 2001. CW1 was directly involved with the reporting of OdysseyRe's financial figures as he was responsible for assembling OdysseyRe's investment information for use in its monthly and quarterly reports.   As detailed below, CW1 provided information concerning OdysseyRe's internal controls and Watsa's involvement with OdysseyRe.

42.     CW2 worked as a claims examiner for OdysseyRe between 1999 and 2004.  CW2 provided information concerning OdysseyRe's internal recordkeeping and run off operations.

43.     CW3 worked as an account representative for Fairmount from 2004 to mid-2005. CW3 provided information concerning Fairmount's operations and management.

44.    CW4 worked as a senior investment accountant at Fairfax's headquarters in Ontario, Canada from the beginning of 2003 to 2004. CW4 personally met with Watsa and provided reports that were reviewed by Fairfax's managers, including Watsa and Williamson, "regular[ly]" during finance meetings. CW4 reported to Jerry McGuire ("McGuire") who in turn reported directly to defendant Williamson. CW4 provided information on Fairfax's controls and the Company's recordkeeping and financial reporting practices.

45.    CW5 was hired as an audit consultant for OdysseyRe for eight months in 2003. As detailed below, CW5 described OdysseyRe's internal controls as "scary" and stated that OdysseyRe's audit was "definitely a fail." CW5 informed class counsel that it was her responsibility to ensure that all department heads, including Watsa, received a copy of her audit report.

46.    CW6 worked as a senior financial analyst for Hudson, a subsidiary of OdysseyRe, between 2003 and 2004. This witness's job entailed journal entry and ledger account analysis/reconciliation and review of quarterly and year end reports. CW6 provided information about Hudson's internal controls and its recordkeeping and financial reporting practices. According to CW6, Hudson's numbers were "rolled up to OdysseyRe" each quarter.

47.    CW7 worked as a programmer and senior analyst at OdysseyRe between 2003 and 2006. CW7 provided information about Watsa's involvement at OdysseyRe.

48.    CW8 joined Fairfax in 2001 to help the Company develop e-business opportunities for MFX. CW8 worked at MFX until 2006. CW8 provided information about MFX's relationship with Fairfax, including MFX's questionable billing practices and Fairfax's use of MFX to "funnel money elsewhere."

49.     CW9 last worked as an executive within OdysseyRe's internal audit department in 2004.  CW9 began her career at OdysseyRe in 1987 working for OdysseyRe's predecessor company.  As detailed below, CW9 provided information about OdysseyRe's lack of risk transfer tests for finite reinsurance contracts and the pressure placed on OdysseyRe to appear profitable.

## V.     JURISDICTION AND VENUE

50.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. § 240.10b-5.

51.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331 and 28 U.S.C. §1367.

52.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Many of the acts and transactions forming the basis for the claims in this action, including the preparation and dissemination of materially false and misleading information, and the failure to disclose material information, occurred in substantial part in this District.

53.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications and the facilities of the national securities markets.

54.     Pursuant to the judicially prescribed "effects test" for asserting extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims for Fairfax securities traded in and/or purchased in both the U.S. and Canadian markets.  This Court

has subject matter jurisdiction over the claims of domestic and foreign members of the class because the Defendants' fraudulent conduct had an impact upon the United States' markets and upon investors located within the United States. As detailed herein, the interests of all investors were adversely affected by the Defendants' misconduct. Defendants' fraudulent conduct, including acts which were performed in the United States, artificially inflated the price of the Company's securities during the Class Period and affected the integrity of the prices paid for Fairfax securities in the United States and abroad.

55.     This Court may also properly exercise subject matter jurisdiction under the "conduct test." As articulated by the Second Circuit (and other courts), the conduct test provides that a federal court has subject matter jurisdiction if: (1) the defendants' activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere and (2) the activities or culpable failures to act within the United States "directly caused" the claimed losses. *See e.g., S.E.C. v. Berger*, 322 F.3d 187, 193 (2d Cir. 2003).

56.     The facts alleged herein show that substantially all of the activity in furtherance of the Defendants' fraud occurred within the United States and that Defendants' conduct within the United States damaged members of the Class worldwide.

57.     Fairfax could not have perpetuated its scheme as detailed herein without the fraudulent acts which occurred within the United States. As stated in Fairfax's SEC filings, the bulk of the Company's operating assets are located within the United States and the Company readily admits its reliance on the United States to drive its business. *See e.g.,* Fairfax's 2003 Annual Report at 49 ("the majority of the company's operations are in the United States or conducted in U.S. dollars...."). *See also* Fairfax's Prospectus filed with the SEC on Form F-10

on March 23, 2004 at 1 ("The United States is our largest market, accounting for 56.0% of net premiums earned for the year ended December 31, 2003. . . .").

58.     Moreover, on at least three occasions the Defendants held investor conferences in New York.   Indeed, as Watsa boasted during an investor conference that took place on November 8, 2004, "[t]his is our third investor conference that we've held in New York." During these investor conferences, the Defendants issued false and misleading statements about Fairfax and its subsidiaries. *See infra*, ¶¶358-63, 421-25.

59.     Defendants' fraud-related conduct in the United States was part of a single fraudulent scheme spanning the United States and other countries around the world.   The domestic conduct was instrumental in causing Lead Plaintiff's and other Class members' losses.

60.     There was but a single worldwide market for Fairfax's securities.   Fairfax securities were priced based on trades reported from U.S. and Canadian exchanges.   That worldwide market was defrauded by Defendants' conduct, causing extensive effects on domestic purchasers of Fairfax securities, as well as purchasers from foreign markets.

61.     In the United States, Fairfax sold artificially inflated securities by means of false and misleading statements in financial reports, offering memoranda, press releases, and statements made during investor conferences held in New York.

62.     Fairfax actively marketed and sold its securities in the United States despite the Company's false reporting of its financial condition as alleged herein.

63.     Fairfax's subordinate voting shares were traded in the United States on the NYSE throughout the Class Period and its primary subsidiaries, including, C&F and OdysseyRe, are U.S. corporations with their principal offices located in the United States and file financial

reports with the SEC. Further, Watsa, serves as the chairman of OdysseyRe, which is a Delaware corporation with its principal offices located in Stamford, Connecticut.

64.    Moreover, throughout the Class Period, Fairfax regularly filed false and misleading reports with Canadian securities officials and the SEC, including quarterly, six-month and annual reports which were relied upon by investors in the United States and abroad in making investment decisions concerning the Company's securities. Also during the Class Period, false and misleading statements made outside the United States were disseminated into the United States and internationally through the means and instrumentalities of international and interstate commerce including, but not limited to, the mails, interstate telephone communications, the Internet and other electronic media.

65.    Defendants also engaged in extensive activities in the United States, which were more than merely preparatory, to further their fraud, which led to, *inter alia*, subpoenas being issued by the SEC to Fairfax, Fairfax's subsidiaries, Watsa, PWC, as well as, scrutiny of documents produced by Fairfax to the SEC by the U.S. Attorney's Office. As described below, among other things: (1) Fairfax's domestic subsidiary, OdysseyRe restated its financial results which were filed with the SEC and admitted to the improper use of finite reinsurance contracts; (2) many of the confidential witnesses relied upon in support of the allegations in this complaint have come forward with information revealing that Fairfax and its United States based subsidiaries lacked adequate internal controls and/or did not employ risk transfer tests when entering into finite reinsurance contracts; (3) on June 24, 2005, the Company announced that its Fairmont subsidiary, which according to Fairmount, is one of Fairfax's primary United States insurance groups, *see http://www.fairmontspecialty.com/*, received a subpoena from the SEC requesting documents regarding any non-traditional insurance product transactions entered into

by Fairmont; (4) on September 7, 2005, the Company announced that it had received a second subpoena from the SEC requesting documents regarding any non-traditional insurance or reinsurance transactions entered into by Fairfax or its subsidiaries; (5) on September 26, 2005, the Company announced that it had received a third subpoena from the SEC as part of its investigation into such loss mitigation products and that the SEC was also looking into transactions with the Company's securities; (6) On October 11, 2005, Fairfax also disclosed that the U.S. Attorney's office for the Southern District of New York is reviewing documents produced by the company to the SEC and is participating in the investigation of these matters; and (7) on March 22, 2006, Fairfax announced that Fairfax and Watsa received subpoenas from the SEC concerning the Company's "review" of finite insurance contracts. The Company also announced that PWC received a subpoena (and a request for cooperation in Canada) from the SEC relating to matters which are the "subject of the SEC['s] subpoenas issued to the company...."

66.    Moreover, Fairfax has itself accessed the United States' courts. Specifically, on July 26, 2006, and in an effort to blame short-sellers of the Company's stock for the collapse of Fairfax's stock price, Fairfax filed a lawsuit seeking billions in damages from a number of defendants who, the Company alleges, manipulated the price of Fairfax's securities. Fairfax and C&F filed the complaint in the Superior Court, Morris County, New Jersey.

67.    The Company has also willingly consented to the jurisdiction of the United States' courts. Specifically, in connection with the Company's offering of 7 3/4% notes due on 2012, the Company filed a supplemental prospectus on August 25, 2004 (the "August 25, 2004 Supplemental Prospectus"). In the August 25, 2004 Supplemental Prospectus, under the heading "Consent to Jurisdiction," Fairfax declared:

> The indenture provides that we will irrevocably appoint CT
> Corporation System, 111 Eighth Avenue, New York, New York
> 10011 as our authorized agent for service of process in any legal
> action or proceeding arising out of or relating to the indenture or
> the notes for actions brought under federal or state securities laws
> or for actions brought by either trustee in any New York Court,
> and will irrevocably submit to the jurisdiction of the New York
> Courts for such purposes.

## VI.    CLASS ACTION ALLEGATIONS

68.    This is a class action on behalf of purchasers and acquirers of Fairfax's securities during the Class Period pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased and/or acquired Fairfax securities during the Class Period, and who suffered a loss as a result of said purchase or acquisition (the "Class").

69.    Excluded from the Class are (a) the Defendants and their officers and directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any Defendant has a controlling interest or of which any Defendant is a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

70.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fairfax's subordinate voting shares were traded on the New York and the Toronto stock exchanges.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there may be hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Fairfax or its transfer agent and other market

intermediaries may be notified of the pendency of the action by mail, using the form of notice similar to that customarily used in securities class actions.

71.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  The questions of law and fact common to the Class include whether the Defendants: (a) violated the Exchange Act; (b) violated the Securities Act; (c) omitted and/or misrepresented material facts; (d) knew or recklessly disregarded that their statements were false; (e) artificially inflated the value of Fairfax's securities during the Class Period; and (f) the extent of and appropriate measure of damages.

72.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as Lead Plaintiff and members of the Class sustained damages arising out of Defendants' violations of federal law as complained of herein.

73.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the other Class members.

74.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   HISTORY AND BACKGROUND OF FAIRFAX

75.     Fairfax's evolution into the insurance behemoth that it is today began in 1984, when Watsa and a former colleague, Tony Hamblin, founded an investment management firm, called Hamblin Watsa Investment Counsel.  This company was to implement the principles of "value-investing"—searching for long-term growth options in undervalued companies—that Watsa had embraced early in his career as an investment analyst.  Starting with a $30,000 investment in 1984, Hamblin and Watsa soon began managing pension funds for numerous companies based on these principles.

76.     According to Watsa, in an interview with the *Globe and Mail* newspaper in January 2006, encouraged by another former colleague—and now a vice president at Fairfax—Francis Chou, he began exploring Warren Buffet's ("Buffet") business strategies.  Buffet had accumulated tremendous wealth for shareholders of his company, Berkshire Hathaway, by acquiring companies with large amounts of cash to invest, such as insurance companies, and then investing this cash for greater returns than these insurance companies could otherwise achieve with their assets.  Watsa embraced Buffet's strategy for Fairfax and thus began to acquire struggling insurance companies for below their book value.  He then sought to turn around their core operations and, using his investment acumen, achieve greater returns for increased profits.

### A.     Fairfax Expands Through Acquisitions

77.     In 1985, Watsa acquired a moribund Canadian trucking insurance company called Markel Financial Holdings.  The Company was controlled by Steven Markel ("Markel") and Watsa believed that a cash infusion would energize Markel's family business to bring in more premiums and free up reserves for other investments.  With cash from Hamblin Watsa, Watsa become Chairman and CEO of Markel.  In 1987, Watsa reorganized Markel and the company was renamed Fairfax Financial Holdings Limited.

26

78.     Through the 1980s and 1990's, Fairfax grew by acquisition and created huge shareholder gains through these acquisitions.  Between 1985 and 1992, Fairfax acquired several Canadian insurance subsidiaries operating in the areas of property and casualty insurance, investment management, insurance claims management, and life insurance.  Thus, from 1985 to 1992, Fairfax's revenues grew from C$17 million to C$286.8 million.

79.     In 1993, Fairfax began what would evolve into a significant expansion into the U.S. property and casualty commercial insurance market.  Fairfax's acquisition of U.S. based companies focused on financially distressed or run-off insurance companies and these acquisitions were financed by a combination of debt and the issuance of Fairfax subordinated voting shares.

80.     Fairfax's acquisition binge propelled its stock to incredible returns.  From an offering price of C$3.25 in 1985, by 1998, Fairfax's stock was trading on the Toronto stock exchange for prices as high as C$500 per share and Watsa believed that Fairfax was invincible. Moreover, Fairfax's investors' expectations were raised year after year as the Company promised to earn high returns.  As stated in Fairfax's 2000 Proxy Circular, "The Corporation's focus is on earning a superior (20% or more) return on shareholders' equity over the long term. . . ."  Although later Circulars changed "20% or more" to "superior" returns, Fairfax has kept shareholders' expectations high throughout the Class Period.  As late as February 2005, Watsa emphasized to investors Fairfax's goal to earn shareholders' a fifteen percent return on equity.

**B.     The Acquisition of TIG And Crum & Forster**

81.     Fairfax's acquisition of U.S. based companies culminated in the acquisition of C&F in March 1998 from the Xerox Corporation for $565 million.  The acquisition surprised industry insiders as the Xerox Corporation had been trying to sell C&F for a number of years due

to its lackluster performance.   Watsa believed that he could improve C&F's operations and benefit from its large asset base.

82.     Watsa was so confident in his strategy that he acquired yet another struggling U.S. based insurer, TIG Holdings, which served specialty commercial markets, for $847 million. Again, the acquisition surprised industry insiders because of TIG's widely recognized failings.

83.     In acquiring TIG and C&F, Watsa believed that he could use dividends from these companies for investment to continue to fuel Fairfax's growth.   However, in order for TIG and C&F to remit dividends to Fairfax, Watsa had to ensure that these new subsidiaries were properly reserved to handle their liabilities.

84.     Under the state laws in which C&F and TIG operated, Fairfax's U.S. subsidiaries could not pay dividends to its parent stockholder unless they were able to demonstrate adequate reserves. Fairfax shored up C&F's and TIG's reserves through internal reinsurance with its Irish subsidiary, InSpire Re. InSpire Re, in turn, had to prove to U.S. regulators that it had adequate liquidity to reinsure Fairfax's U.S. subsidiaries by furnishing letters of credit evidencing its liquidity.   InSpire obtained these letters of credit from lenders, based on Fairfax's liquidity. Thus, in order for this elaborate balancing act to work, Fairfax had to have adequate liquidity.

85.     Fairfax assumed tremendous liability in connection with the TIG acquisition. These liabilities strained its existing reserves so much so that Fairfax obtained a $1 billion "stop loss," or finite reinsurance, treaty with a subsidiary of Swiss Re to shore up Fairfax's reserves (the "Swiss Re Cover").   Pursuant to the Swiss Re Cover, Fairfax was able to cede losses (for which it would otherwise have to maintain reserves) to Swiss Re and record the amount ceded to Swiss Re as a reinsurance receivable (an asset). This stop loss treaty was assigned to InSpire Re.

In turn, InSpire Re provided reinsurance to TIG. With the acquisition of the Swiss Re Cover, Watsa told shareholders that it was his belief that both TIG and C&F were adequately reserved.

86.     Despite these assurances, reserves at TIG and C&F in succeeding years proved wholly inadequate to cover these companies' losses. In each of the years 2000, 2001 and 2002, Fairfax was forced to recognize reserve deficiencies at TIG and C&F.

87.     TIG and C&F's reserve deficiencies were due to a number of factors. Both C&F and TIG, at the time of their acquisition, had endemic and long-standing problems in the quality of the claims they were underwriting and, accordingly, had suffered large losses on their policies. In addition, both acquisitions were made at the beginning of what was widely recognized as a "soft-pricing" cycle in the insurance industry. During soft pricing cycles, competition among insurers is at its highest and insurers are forced to take on riskier business for lower premiums. The cycle is reversed when catastrophes cause premiums to escalate. Finally, in the years following TIG and C&F's acquisition, unexpected losses in the property and casualty business as a result of the terrorist attacks of September 11, 2001 and natural disasters had escalated claims. Because of the cash shortage resulting from reserve shortfalls at TIG, Watsa decided to sell almost 20% of OdysseyRe in a public offering in December 2001.

88.     On March 8, 2002, Watsa wrote to shareholders:

> As I write this letter to you, I must say that I am shocked at our atrocious results over the last three years and I sincerely apologize to you, our shareholders. As it is for myself and most of our Board members, Fairfax officers and Hamblin Watsa principals, for many of you your investment in our company constitutes a significant portion of your net worth, which makes these results more painful. As always, we have disclosed the past, studied it and learned from it, and we continue to be focused on performing for you as we have done prior to the past three years. Our loss in 2001 emanated from the large losses we suffered in the third quarter of 2001 which prompted my letter of November 3, 2001 to you (reproduced in Appendix A) and also prompted us to have our first ever

conference call to explain the losses and answer all your questions. As the letter explains, our third quarter loss was a result of two negative surprises: World Trade Center losses and reserve deficiencies. The reserve deficiencies at C&F and TIG were particularly embarrassing because we had recognized reserve deficiencies in 2000 and, in fact, had told you in last year's Annual Report that we did not expect this to be repeated in 2001. As our letter indicated, these deficiencies were an industry phenomenon (the U.S. industry reported in excess of US$8 billion in adverse reserve development in 2001) and our management teams had been running their companies for only two years. Against the backdrop of the worst insurance market in 30 years, it has taken longer for us to recognize and fix the problems of the past – much longer than we had expected when we purchased both these companies.

89.     By the end of 2002, TIG's and C&F's reserve deficiencies had become severe enough to threaten Fairfax's balancing act and cause a financial tailspin. The capital Watsa required to invest was tied up in reserves; thus, Watsa was deprived of the funds needed to maintain liquidity and profitability. Without liquidity and profitability, Fairfax faced downgrades by insurance and credit rating agencies which would, in turn, increase the cost of underwriting profitable business and thus increase the cost of capital.

90.     Indeed, in 2002 and 2003, there were ample signs that Fairfax was heading into a tailspin. In 2002, Fairfax posted its first reported loss of $346 million.

91.     The losses suffered by TIG and C&F were exacerbated by reduced credit ratings by ratings agencies in the wake of the criticism of the adequacy of Fairfax's reserves. In December 2002, Fairfax, in an effort to extract a dividend from TIG, discontinued TIG's lines of business and placed the subsidiary into run-off. This move was necessary in order for Fairfax to release assets that were being held in trust by state regulators for the benefit of TIG claimants.

92.     As explained by Fairfax in its 2002 Annual Report:

We merged TIG and IIC effective December 16, 2002 and, with the California Department of Insurance's approval, distributed $1.25 billion of assets to Fairfax, including 33.2 million of TIG's 47.8 million shares of OdysseyRe Holdings, all of the shares of

30

Commonwealth (GAAP equity of approximately $207 million) and all of the shares of Ranger Insurance (GAAP equity of approximately $136 million). *These distributed securities will initially be held in trust for TIG's benefit. If the US$300 million adverse development cover described above is placed externally to California's satisfaction, then up to US$300 million of securities will be released from the trust.* If at the end of 2003 TIG has US$500 million of statutory surplus, a risk-based capital of 200% and a net reserves to surplus ratio of less than 3:1, substantially all of the remainder of these assets will be released from the trust. We continue to expect to meet these tests at the end of 2003 and are also working on acquiring the cover at a reasonable cost.

(emphasis added).

93.     Watsa intended that the encumbered TIG assets would be used to secure lines of credits and get Fairfax much needed cash for investing.

### C.     Watsa Tries To Raise Money For Fairfax To Meet Regulator's Liquidity Requirements

94.     Faced with a one year time frame to boost Fairfax's liquidity in order to release TIG's assets, Watsa began fervently raising cash for Fairfax.

95.     Almost simultaneous with the winding up of TIG's business, on December 18, 2002, Fairfax listed its subordinate voting shares on the New York Stock Exchange ("NYSE"). The listing on the NYSE was intended to allow Fairfax greater access to investors in the United States.   In May 2003, Watsa sold 29% of Northbridge Financial, the only profitable North American insurance subsidiary, raising approximately Cdn$200 million.   He also sold $300 million in a private placement note offering of C&F debt.

96.     For Watsa, however, listing on the NYSE had unintended consequences:  greater scrutiny of his company's business by stock analysts.

97.     Shortly after Fairfax's shares began trading on the NYSE, analysts started to question the transparency of Fairfax's disclosures and, in particular, questioned the adequacy of the Company's reserves.

98.   On January 16, 2003, John Gwynn ("Gwynn"), an analyst with Morgan Keegan, issued a report which, *inter alia*, raised concerns that Fairfax's reserves were not adequate and questioned the Company's use of off-balance sheet funding and finite reinsurance.  Gywnn claimed that, based on his calculations, Fairfax was vastly underestimating the size of its liabilities and, in fact, the Company was under-reserved by almost $5 billion.  Gwynn later revised this figure to $3 billion.  Gwynn also claimed that the Company was using a high rate of reinsurance recoverables on the balance sheet as a percentage of net worth.

99.   In March 2003, Fitch reduced the rating of some of Fairfax's debt to junk status.

100.   Reinsurance is accounted for on a company's balance sheet as an asset.  When an insurer acquires a reinsurance contract, the reinsurance strengthens assets, while the premium is charged against income as an expense.

101.   In response to the issues raised by Morgan Keegan's January 16, 2003 report, Fairfax made several statements seeking to reassure investors that the Company was operating under the highest ethical standards and that the issues raised by Morgan Keegan were without any merit.

102.   Specifically, in the first response to the report, which came by way of a press release dated January 20, 2003, Watsa stated:

> Fairfax has always been run with honesty and integrity and has always intended to provide comprehensive disclosure in its Annual Report. If Fairfax's operations encountered difficulties, we faced them head-on, reported them candidly and absorbed their impact. We have consistently looked to protect the downside and concentrated on creating options to ensure that we could meet our obligations.
>
> From the beginning, our reserves have been reviewed by company actuaries, by an actuary at Fairfax and by one or more independent actuaries and have been subject to regulatory review. Our reserves have received careful consideration and have been established using accepted actuarial practice. The valuation methodology for

reserves employed in a recently issued research report on Fairfax suffers fatally from the inherent limitations admitted by that report and a complete lack of knowledge of the factual details necessary to produce a reserve calculation. We are certain that the loss reserve deficiencies suggested by that report are totally wrong and have no validity whatsoever.

103.   Again in the Narrative Description of Business, which was filed as an exhibit to the Company's 2002 Annual Report (filed with the SEC on Form 40-F on May 21, 2003) and signed by Watsa, Fairfax and Watsa sought to comfort investors by stating:

We listed on the NYSE on December 18, 2002 as we suggested we might. We were warmly welcomed and on January 14, 2003, the NYSE reported that there were almost 2 million shares shorted! Soon after, there was a spate of negative articles and reports on Fairfax, including a report containing seriously misleading commentary on Fairfax's reserves.

We have always tried to give very full disclosure in our annual reports, and we expand that disclosure if we discover that there are areas where enhanced disclosure would be useful (this year, for instance, our MD&A includes significantly expanded disclosure on our ORC Re subsidiary and our asbestos and pollution reserves).

\* \* \*

The strengths that we have at Fairfax are formidable and have not changed from the ones I listed for you in the 2001 annual report. Your management team has truly been tested in the last few years and has every intention to do well by you (as we did in spades in 2002), irrespective of circumstances. *As discussed earlier in this letter, our businesses – our insurance, reinsurance and investment operations – are performing magnificently*.

(emphasis added).

104.   These assurances, however, as set forth below, were false.

## VIII.   THE FRAUDULENT SCHEME TO INFLATE FAIRFAX'S FINANCIALS

105.   In counteracting the liquidity problems arising in 2002 and 2003, Fairfax employed a two tier strategy.  At the top, above-board, tier, its efforts involved raising cash by selling debt and equity in its subsidiaries.  Below-board, Fairfax resorted to a variety of tricks to

deceive investors about the value of its assets. These tricks included fraudulently accounting for reinsurance contracts by, among other things, failing to employ adequate risk transfer tests to determine if reinsurance contracts qualified for "reinsurance" rather than "deposit" accounting; maintaining ineffective controls while assuring investors that the Company's controls were effective; using investment funds domiciled in foreign jurisdictions with lax oversight to permit the Company to manipulate the value of its overseas investments; failing to properly account for losses in companies that should have been consolidated into Fairfax; improperly accounting for intercompany transactions; and disguising loans as "investments" to funnel money to cash strapped subsidiaries.

      A.      **Fairfax's Improper Use Of Finite Reinsurance To Boost Reserves**

      106.    In order for Fairfax to accomplish successful internal growth of premiums and reinsurance, Fairfax needed to separate the runoff operations, be able to convince the ratings agencies that it was a highly rated company and establish the perception of valid reinsurance contracts with highly rated companies and manageable reserves.

      107.    To help accomplish this, Fairfax accounted for certain retroactive reinsurance contracts (or finite reinsurance contracts), which did not transfer a sufficient amount of risk from Fairfax to the reinsuring entity, using "reinsurance accounting" rather than "deposit accounting." As described herein, using reinsurance accounting, Fairfax was able to significantly reduce its net reserves for those losses ceded under these contracts and manipulate its reported financial results. Had the reinsurance contracts being properly accounted for using deposit accounting, Fairfax would exposed for what it really was – a Company teetering on financial collapse because it could not meet its obligations via legitimate means. The improper use of reinsurance accounting violated Generally Accepted Accounting Principles ("GAAP"), overstated

shareholders' equity and ultimately caused Fairfax's financial statements to be materially false and misleading.

108.    The SEC requires that publicly traded companies present their financial statements in accordance with GAAP. *See* 17 C.F.R. §210.4-01(a)(1).  GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R §210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  However, Fairfax violated several GAAP provisions, including SFAS 113 when accounting for finite reinsurance contracts.

109.    Under SFAS 113 ¶¶ 9, 11, 62-63 – *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*, which is a key GAAP provision governing the accounting by insurance enterprises for reinsurance contracts, in order for short duration contracts (property and casualty contracts) covering prospective reinsurance to qualify for favorable reinsurance accounting treatment, ***both*** of the following elements must be met: (a) the reinsurer must assume significant insurance risk, and (b) it must be reasonably possible that the reinsurer may realize a significant loss from the transaction or the reinsurer assumes substantially all of the insurance risk relating to the reinsured portions of the underlying contracts.  Generally, SFAS 113 applies to all reinsurance contracts entered into after December 15, 1992.

110.    Reinsurance contracts that do not transfer sufficient risk are classified as deposits or loans.

111.    Implicit in an entity assuming risk is the requirement that both the amount and timing of the reinsurer's payment depend on and directly vary with the amount and timing of claims settled under reinsured contracts.

112.    Although finite reinsurance products have been in use for nearly two decades, during the past several years, federal and state regulators have begun to investigate the propriety of certain finite reinsurance transactions and the manner in which those transactions are being accounted for by the insurers and reinsurers involved. The concern expressed by these regulators is that such finite arrangements are being improperly accounted for as reinsurance contracts under SFAS 113 when they are instead risk-less financing deals designed merely to distort an insurer's true financial position.

113.    The key inquiry, according to regulators, is whether these transactions involve a sufficient transfer of risk from insurer to reinsurer so as to qualify as a reinsurance contract instead of a financing transaction. The rule of thumb in the industry is that a reinsurance contract is reinsurance (and thus qualifies for reinsurance accounting treatment) if the contract transfers to the reinsurer a "ten percent risk of ten percent loss."

114.    Transactions that qualify as reinsurance receive more favorable accounting treatment than transactions in which there is an insufficient transfer of risk, as the latter must be reported as debt rather than reinsurance.

115.    If the transaction is considered reinsurance, and the contract extinguishes the ceding insurer's liability to its insured, then the assets and liabilities associated with the transaction are removed from the ceding insurer's financial statement. If the transaction is considered reinsurance but the cedant's liability is not extinguished, then the cedant reports estimated "reinsurance receivables" as an asset on its balance sheet. If, however, there is an

36

insufficient transfer of risk, the arrangement is more akin to a loan, and "deposit" accounting must be used (the reinsurance premium must be recorded as an asset in the ceding company's books and the payments from the reinsurer are recorded as investment income and return of deposit).

116.   As admitted in Fairfax's restatements, the Company improperly assigned reinsurance contracts "reinsurance accounting" rather than "deposit accounting."

117.   Regulators also are concerned that informal "side-letters" may exist as companions to finite risk reinsurance contracts (and that such letters materially alter the amount of risk that is actually transferred).  In the view of investigators, such side-letters often record a separate (and secret) understanding between the insurer and reinsurer that take some or all of the elements of risk transfer out of the original contract.  A basic example of a side letter involves a promise by the company that has bought reinsurance not to make a claim during the period of the agreement.  Other side-letters state that, regardless of how the risks covered by a contract turn out, the reinsurer will never pay the insurer more than it has received in premiums.  Side-letters also can include a "commutation clause," stating that if the risks covered by the official reinsurance transaction start to become excessive, the reinsurer has the right to cancel the whole policy on terms that mean it still will make a profit.  Needless to say, the favorable accounting treatment afforded to reinsurance contracts is not available where a side-letter, or other mechanisms, establishes that there has not been a sufficient transfer of risk.

118.   The evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction is based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes. The negotiation and structuring of these contracts and the required evaluation of the necessary transfer of risk were

37

all the responsibility of Fairfax as the ceding insurer, yet it was not until the restatement was issued on August 31, 2006, that the Company finally disclosed that they repeatedly used reinsurance accounting where the contracts did not support the required transfer of risk to the reinsurer.

119.    Despite Fairfax's recent admission that it applied "reinsurance" rather than "deposit" accounting, confidential witnesses revealed that Fairfax simply did not have in place any risk transfer tests when dealing with finite reinsurance contracts.

120.    According to CW9, a senior executive in OdysseyRe's audit department, although assessing risk was the key element for testing whether finite reinsurance contracts qualified for reinsurance accounting, Fairfax and its subsidiaries never even developed any protocols to test for risk transfer in Fairfax's finite reinsurance transactions.   Thus, finite reinsurance contracts were approved for accounting under SFAS 113 without the necessary determination of whether these contracts transferred risk.

121.    Failure to support transfer of risk results in having to account for the reinsurance contracts under the deposit method of accounting.  In effect, this requires that the transaction be recorded as a ***risk-less financing transaction*** rather than a reinsurance contract with indemnification of loss or liability.   Under deposit accounting in the AICPA Accounting Standards Executive Committee Statement of Position "SOP" 98-7, *Deposit Accounting: Accounting for Insurance and Reinsurance Contracts That Do Not Transfer Insurance Risk* and SFAS No. 113, liabilities are not mitigated by reinsurance receivables. The reinsurance premium is simply recorded as an asset in the ceding company's books and the payments from the reinsurer are recorded as investment income and return of deposit.

122.   Fairfax has admitted in its restatement that finite reinsurance contracts entered into in 2001 failed to satisfy the transfer-of-risk test and thus, had to be restated.   As a result of using reinsurance accounting for these finite reinsurance contracts, among other accounting gimmicks, Fairfax was able to understate the Company's net reserves and overstate the recoverables from reinsurers under Canadian GAAP.   In reversing these improper transactions, Fairfax suffered a decrease in shareholder equity during the Class Period because its finite reinsurance transactions had boosted assets by recognizing them as reinsurance receivables. Gains recognized at the time the contracts were entered into had to be reversed and, as a result, Fairfax's losses at the time that the contracts were entered into increased.   Because these contracts should have been subject to deposit accounting, any investment gains recognized from the deposit had to be amortized over the length of the contract, thus increasing Fairfax's income—as reflected in the restatement—over the years following the contract.

123.   As part of their restatements filed on November 10, 2006, Fairfax has disclosed the following misuse of reinsurance accounting:

(a)   Fairfax restated the accounting for certain reinsurance contracts entered into in 2001 and commuted in 2004. It was determined that these contracts failed to provide a transfer of risk, as required by SFAS No. 113. Coverage related to the contracts commuted in the third and fourth quarters of 2004 totaled $665 million.   These contracts were restated by Fairfax to correctly apply the deposit method of accounting in place of the reinsurance accounting.   The restatement had the net effect on a Canadian GAAP basis of decreasing the 2004 net loss by $89.5 million, increasing 2003 net earnings by $18.4 million, decreasing 2002 net earnings by $11.4

39

million and increasing the 2001 net loss by $96.5 million. Conveniently, Fairfax's restatement does not reveal by how much these restated finite reinsurance contracts—commuted in 2004—boosted its assets (and thus shareholders equity) in the years prior to 2004, as the restatement only indicates the effect of these restated finite reinsurance contracts on 2004 and 2005 shareholders equity. However, the cumulative impact of the restatement of shareholder equity for 2003 and 2002 was $454.1 million and $353.5 million, respectively.

(b)     Fairfax also restated the accounting for a reinsurance contract entered into by a subsidiary in 1998, prior to its acquisition. The Company commuted this contract in 2002. Fairfax restated the accounting to apply the deposit method of accounting rather than reinsurance accounting as this contract also failed to transfer risk to the reinsurer. The restatement had the net effect, on a Canadian GAAP basis, of increasing the 2002 net earnings by $1.7 million, decreasing 2001 net losses by $11.9 million and decreasing the 2000 and prior net earnings by $13.6 million. Again, Fairfax does not reveal by how much this reinsurance contract boosted its assets (and thus shareholder equity) prior to 2002.

**1.     Retroactive Reinsurance Accounting Differences Between Canadian And US GAAP**

124.     There is a distinct difference between the accounting for retroactive reinsurance accounting under Canadian GAAP and US GAAP. Under US GAAP, retroactive reinsurance recoveries are recorded up to the amount of the premium paid with the excess of the claims incurred (i.e. liabilities ceded) over the premiums paid recorded as a deferred gain and amortized

to income as the claims are paid.  As a result, US GAAP earnings will be lower than Canadian GAAP at the time of claims cession, but will exceed Canadian GAAP in the future as the deferred gain is amortized into income.

125.    As a result of the timing differences between Canadian and US GAAP, the Company's restatement for the inappropriate use of reinsurance accounting for the retroactive contracts discussed above, had the additional effect on a US GAAP basis of decreasing net income in 2004 by $33.2 million, decreasing net income in 2003 by $9.4 million, and increasing the net income for 2002 and prior by $42.6 million.

### 2.    Improper Reinsurance Accounting At OdysseyRe

126.    The use of improper accounting for certain reinsurance contracts was not limited to Fairfax at the parent level.

127.    On March 31, 2006, OdysseyRe also restated its consolidated financial statements as of and for the years ended December 31, 2000 through 2004, as well as its financial statements for the nine months ended September 30, 2005, to correct for the improper accounting for reinsurance contracts entered into by OdysseyRe between 1998 and 2004.

128.    The total cumulative impact of the OdysseyRe's restatement through September 30, 2005 on Fairfax was to decrease shareholders' equity at September 30, 2005 by $4.8 million.  The aggregate net effect of the restatement for each period is to increase the net loss for the nine months ended September 30, 2005 by $1.6 million, decrease 2004 net loss by $13.9 million, increase 2003 net income by $3.7 million, increase 2002 net income by $5.2 million, increase 2001 net loss by $22.7 million and decrease net income of 2000 and prior by $3.3 million.

129.    According to the OdysseyRe restatement included as part of its Form 10-K filed on March 31, 2006, there were five separate reinsurance transactions restated by OdysseyRe. The

41

GAAP violations, including the full effect on OdysseyRe's financial statements, are summarized as follows:

> OdysseyRe restated the accounting in 2002 and thereafter for a $175 million ceded reinsurance contract with Skandia for net unpaid losses and loss adjustment expenses and reserves for uncollectible reinsurance that was assigned by Skandia to nSpire Re for $97.0 million in consideration in January 1999. OdysseyRe violated SFAS No. 113 in originally accounting for the contract as prospective reinsurance for 2002 and subsequent periods, where a benefit had been recorded in each period equal to the loss cessions made under the contract. OdysseyRe should have recorded the transactions in accordance with retroactive reinsurance accounting, where losses ceded under the contract in 2002 and thereafter should have been recorded as a deferred gain rather than as a benefit in the applicable periods. These amounts were in excess of $97.0 million. As part of the restatement, the deferred gain attributable to loss cessions made under the contract in 2002 and thereafter, is being amortized into income over the estimated remaining settlement period. The restatement adjustments under this contract resulted in a $28.6 million after-tax cumulative decrease to shareholders' equity as of September 30, 2005, with the effect of increasing the net loss for the nine months ended September 30, 2005 by $3.0 million, decreasing 2004 net income by $5.7 million, decreasing 2003 net income by $7.2 million and decreasing 2002 net income by $12.7 million. The $28.6 million after-tax cumulative decrease to shareholders' equity as of September 30, 2005 was offset by a gain of $12.5 million after-tax associated with the recognition of a deferred gain recognized for the three months ended March 31, 2006.

> Timing differences as to how premiums and unearned profit commissions under property catastrophe reinsurance contracts were recognized over the coverage periods on seven reinsurance contracts purchased by us and two reinsurance contracts written by us. All of these contracts satisfied risk transfer requirements and were multi-year, retrospectively-rated contracts, or included certain features that had the effect of allowing the contracts to operate as multi-year, retrospectively-rated contracts. The contracts were restated to correct the application of Emerging Issues Task Force Issue No: 93-6 "Accounting for Multiple-Year Retrospectively-Rated Contracts by Ceding and Assuming Enterprises" ("EITF 93-6"). The two reinsurance contracts written by us remained in force as of December 31, 2005. The restated contracts involve eight unaffiliated counterparties. The corrections under these contracts resulted in a $1.3 million after-tax cumulative increase to

shareholders' equity as of September 30, 2005, with the net effect of decreasing the net loss for the nine months ended September 30, 2005 by $2.3 million, increasing 2004 net income by $10.5 million, increasing 2003 net income by $10.9 million, increasing 2002 net income by $8.4 million, increasing 2001 net loss by $29.2 million and decreasing 2000 net income by $1.6 million.

The treatment of deferred ceding commissions to be received by OdysseyRe under three aggregate excess of loss reinsurance contracts they purchased. Due to the deferred nature of the ceding commissions, amounts were reflected at their present value rather than the nominal value previously recorded by us. All of these contracts satisfied risk transfer requirements and remain active as of December 31, 2005. These contracts involve two unaffiliated counterparties. The corrections under these contracts resulted in an $8.4 million after-tax cumulative decrease to shareholders' equity as of September 30, 2005, with the net effect of decreasing the net loss for the nine months ended September 30, 2005 by $0.8 million, increasing 2004 net income by $1.4 million, decreasing 2003 net income by $6.1 million, decreasing 2002 net income by $1.3 million, increasing 2001 net loss by $1.6 million and decreasing 2000 net income by $1.6 million. The cumulative effect of $8.4 million, after-tax, will be amortized into income in future periods.

**B.      Fairfax Never Adopted Procedures To Test for Risk Transfer And Was Devoid Of Internal Controls**

130.    Internal control is defined by COSO (The Committee of Sponsoring Organizations of the Treadway Commission) "as a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: effectiveness and efficiency of operations, reliability of financial reporting, and compliance with applicable laws and regulations." It appears that each of those parties at Fairfax responsible for ensuring the adequacy of the Company's controls has seriously failed the investing public. As disclosed in Management's Evaluation of Disclosure Controls and Procedures (Restated), from the first Form 40-F/A for the year ended December 31, 2005 filed on September 11, 2006, "At the time of the

filing of the Annual Report on Form 40-F for the year ended December 31, 2005, our CEO and CFO concluded that our disclosure controls and procedures were effective as of December 31, 2005. *Subsequent to that evaluation, our CEO and CFO concluded that our disclosure controls and procedures were not effective as of December 31, 2005 because of the material weaknesses discussed below.*" (emphasis added). Until that time, no one at Fairfax ever publicly disclosed what was well known throughout Fairfax and its subsidiaries – that Fairfax and its subsidiaries maintained woefully ineffective internal controls. It was only after the Company's restatement that the public learned that the internal controls at Fairfax and its subsidiaries were in complete shambles.

131.   Fairfax identified four material weaknesses in their restated assessment of the effectiveness of internal controls over financial reporting as of December 31, 2005. However, based on the accounts of confidential witnesses interviewed by Lead Plaintiff's attorneys, it is abundantly clear that these weaknesses existed and continued from periods long before December 31, 2005, rendering financial reporting during each of the preceding periods unreliable and Fairfax's assurances to investors about the adequacy of its controls materially false and misleading. In fact, the most significant effect on net earnings from Fairfax's restatements took place in years 2002 and prior.

132.   The material weaknesses identified by management in their restated assessment filed with Form 40-F on September 11, 2006 were:

> (a)   Fairfax failed to maintain an appropriate accounting and financial reporting organizational structure, including insufficient staffing and not maintaining the appropriate level of accounting knowledge, experience and training.

(b)   Fairfax failed to maintain effective controls over the completeness and accuracy of period-ending financial reporting and close processes, including lack of monitoring and documentation over intercompany eliminations and reconciliation, translation of foreign currency transactions and recording of journal entries.

(c)   Fairfax failed to maintain controls over accounting for derivatives in accordance with SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*.

(d)   Fairfax failed to maintain effective controls over the completeness and accuracy of the income tax responsibilities.

133.   Each of these identified weaknesses is fundamental to an effective internal control environment and absolutely essential to the production of complete and accurate financial statements. As a result, Fairfax violated the fundamental provisions of SFAC, No. 2, that require the principles of quality of reliability and completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.

134.   Watsa and Ambridge also directly violated the requirements under the United States Sarbanes Oxley Act of 2002, Section 302, *Corporate Responsibility for Financial Reports*, and Section 404, *Management Assessment of Internal Controls*. Since 2003, Watsa and Ambridge knowingly signed certifications included with the Company's filed financial statements, attesting to their responsibility for the establishment and maintenance of the internal controls at Fairfax and as to the adequacy of those internal controls, when, in fact, both of them knew that this was far from the truth. The restatements evidence the misuse of accounting

45

principles in consolidation, investments, debt, income taxes, intercompany accounting, foreign currency translations and dividends declared. Such a comprehensive list of errors requiring restatement is indicative of a widespread lack of internal controls and a blatant disregard for the underlying fundamentals of GAAP accounting.

**1.    Confidential Witnesses Confirm That Fairfax's Lack Of Internal Controls Was A Long Standing and Well-Known Problem**

135.    According to Lead Plaintiff's confidential sources, the accounting protocols adopted by Fairfax and its subsidiaries were notoriously obsolete, sloppy and incapable of providing effective reporting to investors. Moreover, top Fairfax officials, including Watsa, received reports from certain confidential witnesses describing the ineffectiveness of Fairfax's internal controls while Watsa was touting the effectiveness of Fairfax's controls to investors.

136.    For example, CW1, who was responsible for assembling OdysseyRe's investment information for use in preparation of the company's monthly and quarterly reports stated that he was unaware of any formal internal controls at OdysseyRe.

137.    Additionally, during 2003, CW5 spent eight months as an outside consultant at OdysseyRe in order to audit the subsidiary's operations. While at OdysseyRe, CW5 who worked with several high level OdysseyRe employees, including OdysseyRe's vice president of internal auditing and Charles Troiano, OdysseyRe's former CFO (Troiano took over as OdysseyRe's CFO in 2001, on March 10, 2005, the company announced Troiano's retirement from OdysseyRe), echoed CW1's assessment of OdysseyRe's deficient controls. CW5 stated that her audit of OdysseyRe resulted in a "fail" and that she authored a report regarding the findings of her audit. According to CW5, it was her responsibility to make sure every department head, including Watsa, received a copy of her report.

138.     Specifically, CW5 stated that "they [OdysseyRe] were twenty years behind the times," OdysseyRe's operations were "nothing but a mess," and that the state of OdysseyRe's controls were "scary."

139.     Indeed, CW5 provided Lead Plaintiff's attorneys with five specific examples of what she described as "alarming" problems at OdysseyRe relating to the subsidiary's deficient internal controls. First, according to CW5, OdysseyRe needed six-months to close its year end financials. CW5 stated that she had "never seen anything like it." According to CW5, most companies closed their books in six to eight weeks rather than six-months. CW5 blamed OdysseyRe's inability to close its books in a timely manner on its lack of controls, which included "inappropriate" and outdated computer systems. These systems, according to CW5, forced OdysseyRe's employees to "hand calculate" the company's financial figures. In Fairfax's report on internal controls (which was included in the Company's restatement), it now admits that one of is control deficiencies was based upon "not maintain[ing] effective controls over the completeness and accuracy of period-end financial reporting and period-end close processes at the Fairfax head office consolidation level...." Fairfax's recent mea culpa corroborates CW5's assessment of OdysseyRe's ineffective controls.

140.     Second, CW5 stated that OdysseyRe had "no tracking of [the] bid process." This deficiency, according to CW5, caused OdysseyRe to compete against itself for bids which led to several OdysseyRe employees "hedging against each other in . . . [a] makeshift system." Third, OdysseyRe did not have in place adequate controls over its expenses as its employees were permitted to sign their own expense checks. Fourth, CW5 disclosed that OdysseyRe used a twenty year old DOS based systems called "RSG" to track its finances. RSG operated on six different versions and offered no consolidation between OdysseyRe's divisions. CW9, an

executive in OdysseyRe's audit department, also stated that RSG "did not report well" and that the system caused "a lot of stress." The problems created by RSG were well known within OdysseyRe. While Watsa and Fairfax were touting the effectiveness of Fairfax (and its subsidiaries' internal controls), according to CW9, in 2004 Trioano (OdysseyRe's former CFO) paid Accenture $3 million to advise OdysseyRe on upgrading its archaic computer system. The upgrade did not occur and CW9 suspects OdysseyRe continues to use RSG.

141.    Finally, according to CW5, OdysseyRe's method for forecasting was "total guesswork" done through hand calculations. The inaccuracies created by this type of process led to, in CW5's estimation, OdysseyRe's restatement.

142.    Moreover, according to CW5 her audit was not kept a secret and "everyone" knew about CW5's audit. Indeed, CW5 provided her audit report to every department head at Fairfax, including Watsa.

143.    The deficient internal controls reported by CW1, CW5 and CW9, were not limited to OdysseyRe.

144.    According to CW3, Fairmount had an "unorganized" management. Additionally, CW6 stated that Hudson (a subsidiary of OdysseyRe) was "not organized" and, as did other subsidiaries, relied on out dated computer systems for its financial reporting. According to CW6, Hudson's antiquated computer systems forced its employees to rely on "a lot of manual calculations." The reliance on manual calculations was a problem because, according to CW6, "we could not get our numbers to match." Rather than correct the problems created by the antiquated computer system, CW6 reported that Hudson "sort of just lived with the problems."

145.    The problems at the subsidiary level also infected the parent. According to CW4, who worked as a senior investment accountant at Fairfax's headquarters in Ontario, Canada from

the beginning of 2003 to 2004, there were "no appropriate controls in place" at Fairfax. CW4 stated, "I have never seen anything like the situation there. The problem? . . . no controls."

146. CW4's entire tenure at Fairfax was devoted to "cleaning up" reconciliations that were incorrectly done. According to this witness, she was only able to clean up about 80% of the information presented to her before its was passed up to her supervisor. This witness stated that the remaining 20% of the mistakes were "never corrected."

147. One of the problems CW4 observed in Fairfax's subsidiaries' reports was that when cash came into one of the subsidiary's accounts, the incoming cash was not matched against the receivables account.

148. CW4 also explained that Fairfax had its own traders based in Ontario and their responsibility was to book the securities for each individual subsidiary on whose behalf they invested. In CW4's case, those subsidiaries were TIG, C&F and Seneca. CW4 worked with these subsidiaries to try and match those earnings that remained as outstanding receivables on the books, even if they had been booked. CW4 stated that, for example, even if revenue was booked at $1 million two quarters earlier, the books she saw still indicated that the money was due. Essentially, CW4 indicated, that this made Fairfax and its subsidiaries look wealthier than they actually were.

149. Moreover, all of the information CW4 reviewed was inputted into a computer program known as "E-PAM," which was created as a package by the software company Princeton Financial Solutions. According to CW4, McGuire, Williamson and all senior management at Fairfax had access to E-PAM "at any time." According to this witness, the unmatched numbers would have been reflected on E-PAM for McGuire and Williamson to view. In addition to management having around-the-clock access to E-PAM, CW4 brought Fairfax's

49

faulty revenue recognition issues directly to her superiors.   Specifically, CW4 alerted her supervisor, McGuire (McGuire was one level removed from Williamson), about the problems in Fairfax's reporting.   According to this witness, McGuire responded to CW4's concerns by saying, "[j]ust make it match."   If the numbers did not match CW4 "let it go."   According to CW4, "a lot" of money was marked as a receivable when it had already been collected.

150.    CW4 also stated that at times money earned by the subsidiaries was not recognized within the proper period.

151.    The problems encountered by CW4 were reported up the chain.   According to CW4, she informed McGuire about the problems she faced in carrying out her duties.   When complaints were lodged, McGuire, according to this witness, became very angry.

152.    Moreover, CW4 stated that Fairfax managers were not qualified to oversee the Company's reporting.   According to CW4, although McGuire reported directly to Williamson, he had not passed the exam to become a Chartered Accountant in Canada and had a difficult time executing "101" accounting procedures such as drawing T-charts for transactions.   Corroborating CW4's account of incompetent managers, in the Company's report on internal controls (which was included in the Company's restatement), Fairfax admitted that one of its control deficiencies was based upon "not maintain[ing] personnel with an appropriate level of accounting knowledge."

C.    **Fairfax Uses Other Gimmicks To Artificially Inflate The Value Of Its Assets**

1.    **Fairfax Uses Off-Shore Entities To Manipulate Its Investment Income**

153.    Finite reinsurance has not been the only illicit means by which Fairfax has deceived investors and regulators regarding the value of its assets.

154.    As reported by the *New York Post*, Fairfax uses unlisted off-shore investments, that are valued at management's discretion, to support the Company's bottom line.

155.    For example, in 2005, on the heels of Hurricanes Katrina and Rita, Fairfax reported a loss of $498 million. Conveniently, the performance of OdysseyRe's investment portfolio added $402 million to Fairfax's bottom line and deflected, in part, the potentially disastrous impact of 2005's Hurricanes.

156.    However, almost all the impressive investment gains, which were relegated to a discrete part of Fairfax's portfolio within its wholly-owned subsidiary, the Hamblin Watsa Asia Fund, domiciled in Mauritius, were the result of the fund's directors having the ability to arbitrarily assign the assets a value. According to the *New York Post*, many of the investments in OdysseyRe's portfolio that contributed to Fairfax's numbers in 2005, were unlisted equities acquired through the Hamblin Watsa Asia Fund. The *Post* reported that the Company's investments in Dublin, another foreign locale, also contributed to Fairfax's bottom line in 2005.

157.    Based on documents obtained by the *New York Post*, the Hamblin Watsa Asia Fund's directors have "absolute discretion" "to assign 'any reduction or increase in the value' to the unlisted equities[.]"

158.    The ability to use unlisted foreign investments that can be valued simply through a director's assessment is critical to Fairfax maintaining its financial appearance because, "Fairfax is losing $15.5 million on its U.S.-traded investments, while on its unlisted foreign investments, which remain curtained off to U.S. authorities, it claims huge gains - more than $400 million."

159.     Accordingly, without the benefit of Mauritius' lax oversight, Fairfax likely would not have been able to manipulate its investment portfolio as a means to mask the Company's losses in 2005.

160.     Fairfax also uses the Hamblin Watsa Asia Fund to deceive insurance regulators by overstating the value of Fairfax's "qualifying" assets.

161.     Recently, state insurance regulators in New Jersey and Delaware questioned Fairfax's investment in Hamblin Watsa Asia Fund.  As reported in the *New York Post*:

> New Jersey insurance examiners said Hamblin Watsa Investment Counsel, an investment manager owned by Fairfax founder and Chief Executive V. Prem Watsa, had more than 5 percent of its investments for the company in assets considered "not permitted or qualifying.
>
> The Delaware report took issue with the Hamblin Watsa Asia Fund, saying the regulatory capital of a Fairfax subsidiary, Fairmont Specialty Insurance, was affected by a large investment in the Mauritius-based money manager.  Fairmont sold its $4.19 million stake in the fund.

162.     According to the *New York Post*, the Delaware regulators also "recommended the company address other concerns, including a failure to fully disclose its directors' conflicts of interest, not obeying rules on 'material transactions with affiliates,' not having the correct number of directors, and not keeping track of its stockholders."

### 2.     Fairfax Overstated Shareholder Equity In 2004 And 2005 By $28.4 Million And Understated Losses By Failing To Properly Record Its Investment In Zenith National Investment Corp.

163.     In 1999 Fairfax purchased a 39% interest in the common stock of Zenith National Investment Corp. ("Zenith").  During the period from 1999 to 2001, the Company improperly accounted for this investment, using the cost basis of accounting even though Fairfax was deemed to have the ability to exercise significant influence over Zenith.  As such, Fairfax

violated APB No. 18, *The Equity Method of Accounting for Investments in Common Stock*, that requires the equity method of accounting for an investment in common stock be used by an investor whose investment in voting stock gives it the ability to exercise significant influence over operating and financial policies of an investee, even though the investor holds 50% or less of the voting stock.

164.   By failing to account for Fairfax's Zenith investment under the equity method from 1999 to 2001, the Company avoided recording their share ($30.9 million) of Zenith's net losses during that period. As much as these effects were prior to the Class Period, by virtue of restating those amounts, Fairfax also had to restate gains recognized in 2004 and 2005 on the sale of interests in the Zenith investment. The gains were decreased as a result of reducing the carrying amount of the Zenith investment by the amount of losses from 1999 to 2001. These corrections resulted in $11.6 million and $16.8 million cumulative decreases in shareholders' equity as of December 30, 2005 and December 31, 2004, respectively.

### 3.   Fairfax Fails To Properly Account for Investments In Convertible Bonds And Other Fixed Income Securities

165.   Fairfax also failed to properly account for convertible bond securities and other fixed income securities with embedded derivatives which were held as investments. The securities that were restated were held as investments by the Company and were purchased between 2001 and 2005. These securities were carried at fair value in accordance with Statement of Financial Accounting Standard No. 115, *Accounting for Certain Investments in Debt and Equity Securities*, due to their designation as available for sale, with corresponding changes in their fair value recorded as a component of other comprehensive income within shareholders' equity. The treatment for these investments was restated to correct for the application of SFAS No. 133. Under FAS 133, changes in the fair value attributable to the embedded option in a

convertible bond or other security is required to be recognized in income through realized gains or losses rather than unrealized gains and losses, a component of shareholders' equity, as previously reported by the Company. The corrections had no cumulative effect on shareholders' equity at December 31, 2004, and had the net effect of decreasing the 2004 net loss by $8.0 million, and increasing 2003 net earnings by $6.5 million. For each of those years, there is a corresponding offsetting change in other comprehensive income. Fairfax did a second restatement as management identified an additional error in its previously reported restated results as of and for the year ended December 31, 2005. In the original restatement for FAS 133 described in (i) above, management incorrectly calculated the net income and other comprehensive income components for certain instruments sold during the year. The corrections had the effect of increasing the 2005 net loss by $26.8 million with offsetting increases in the unrealized net appreciation of investments included in other comprehensive income (loss).

### D.   Erroneous Accounting For Intercompany Transactions That Boosted Shareholder Equity

166.    Fairfax erroneously accounted for various intercompany transactions including incorrect eliminations of gains and losses on intercompany purchases and sales of portfolio investments, write-offs of unreconciled intercompany balances, incorrect elimination of intercompany advances, and related foreign currency accounting. These omissions resulted in an unsupported net asset having been recorded in the consolidated financial statements of the company.

167.    Although the Company made no further disclosures as to the specifics of these transactions, it is clear that Fairfax violated Accounting Research Bulletin ("ARB") No. 51, *Consolidated Financial Statements*, and SFAS No. 52, *Foreign Currency Translation*. ARB No. 51 states "In the preparation of consolidated statements, intercompany balances and transactions

should be eliminated.  This includes intercompany open account balances, security holdings, sales and purchases, interest, dividends, etc.  As consolidated statements are based on the assumption that they represent the financial position and operating results of a single business enterprise, such statements should not include gain or loss on transactions among the companies in the group.  Accordingly, any intercompany profit or loss on assets remaining within the group should be eliminated."

168.    Moreover, SFAS No. 52 requires any gains and losses on long-term intercompany foreign currency transactions not be included in determining net income but rather to be reported as translation adjustments in AOCI.  Fairfax's restatement adjustments resulted in a $157.7 million and $166.1 million cumulative decrease in shareholders' equity as of September 30, 2005 and December 31, 2004 respectively, comprised of a cumulative increase in retained earnings of $1.3 million and a cumulative net charge to the currency translation account ("CTA") of $159.0 million as of September, 2005, and a cumulative decrease in retained earnings of $7.1 million and a cumulative net charge to the CTA of $159.0 million as of December 31, 2004.  The corrections had the net effect of decreasing the Company's 2005 net loss by $8.5 million, decreasing 2003 net earnings by $10.8 million, decreasing 2002 net earnings by $1.7 million, increasing the net earnings of 2001 and prior years by $5.4 million.

169.    Fairfax violated SFAS No. 52 by recording realized foreign currency gains and losses of a subsidiary in accounts payable rather than in earnings during the period 2000 to 2005. According to SFAS No. 52, a transaction gain or loss realized upon settlement of a foreign currency transaction generally shall be included in determining net income for the period in which the transaction is settled. The corrections resulted in a cumulative effect of a cumulative decrease of $40.9 million in shareholders' equity at December 31, 2004 and had the net effect of

decreasing the net loss for the nine months ended December 30, 2005 by $8.3 million, increasing the 2004 net loss by $14.7 million, decreasing 2003 net earnings by $12.8 million, increasing 2002 net earnings by $23.2 million, and decreasing the net earnings of 2001 and prior by $44.9 million.

170.   Fairfax failed to properly account for certain investments received in purchase acquisitions under APB No. 16, *Business Combinations*, which requires all identifiable assets acquired be assigned a portion of the cost of the acquired company, normally equal to their fair values at date of acquisition.   The restatement corrections had no cumulative effect on shareholders' equity as of September 30, 2005 and a $9.8 million cumulative decrease in shareholders' equity at December 31, 2004, and had the net effect of decreasing the net loss for the nine months ended September 30, 2005 by $9.8 million, decreasing 2002 net earnings by $7.9 million, and decreasing the net earnings of 2000 and prior years by $1.9 million.

171.   Fairfax improperly recorded losses on foreign exchange contracts that hedged the 1999 acquisition funding for TIG as a charge to the CTA. The Company improperly recorded the transaction under both Canadian GAAP and US GAAP. Under Canadian GAAP, the losses related to the foreign exchange contract should have been recorded as a revision to the goodwill in the purchase accounting of the Odyssey America Re subsidiary and credited to the CTA in the amount of $23.8 million. Under US GAAP, the foreign exchange contract did not qualify for hedge accounting under SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*. Under the Canadian GAAP restatements, the related unamortized goodwill balance at September 30, 2005 and December 31, 2004 was $17.6 million. Retained earnings had a $6.2 million cumulative decrease at September 30, 2005 and December 31, 2004. Under US GAAP, the $23.8 million in losses were reclassified from goodwill to opening retained earnings at January 1, 2004.

172.   Fairfax repeatedly issued financial statements containing accounting errors originally arising primarily in the head office consolidation process during 2000 and prior years. In so doing, the Company violated ARB No. 51, which states "In the preparation of consolidated statements, intercompany balances and transactions should be eliminated.   This includes intercompany open account balances, security holdings, sales and purchases, interest, dividends, etc.  As consolidated statements are based on the assumption that they represent the financial position and operating results of a single business enterprise, such statements should not include gain or loss on transactions among the companies in the group.  Accordingly, any intercompany profit or loss on assets remaining within the group should be eliminated; the concept usually applied for this purpose is gross profit or loss."  The Company's restatements resulted in a $25.3 million cumulative decrease in shareholders' equity as of September 30, 2005 and December 31, 2004, and had the net effect of decreasing net earnings of 2000 and prior years by $25.3 million.

173.   Fairfax inappropriately accounted for income taxes in accordance with SFAS No. 109, *Accounting for Taxes*, as follows:

(a)   Fairfax improperly recognized the tax impact of an intercorporate dividend. The correction resulted in a $17.2 million cumulative decrease in shareholders' equity at December 31, 2004, and had the net effect of increasing the 2004 net loss by $13.8 million, and decreasing 2003 net earnings by $3.4 million.

(b)   Fairfax improperly recorded the income tax effects on certain foreign currency contracts hedging the company's U.S. dollar investments in subsidiaries in the pre-2004 period that were recorded in earnings rather than in the CTA. The corrections had the net effect of decreasing the 2004

57

net loss by $4.0 million, decreasing 2003 net earnings by $2.9 million, and decreasing 2002 net earnings by $13.0 million.

174.    Fairfax also restated certain items that had little or no effect on current net earnings but were further evidence of the Company's repeated violations of the fundamental principles of GAAP accounting. These items include:

      (a)    Fairfax failed to timely record a dividend declared in 2004 in the amount of $22.5 million and instead recorded it in 2005. This violated Accounting Principles Board Statements ("APS") No. 4, *Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises*, which recognizes that increases in liabilities specifically arise upon transfers between an enterprise and its owners (dividend declaration) as the declaration date governs the incurrence of the legal liability by the Company. The restatement had the effect of increasing liabilities and decreasing shareholders' equity as at December 31, 2004 by $22.5 million.

      (b)    Fairfax failed to properly record the balance sheet reclassification of common shares owned by the company as an increase in treasury stock rather than as an increase in other assets. The Company violated APB No. 6, *Status of Accounting Research Bulletins, Chapter 1B — Treasury Stock*, which requires when a corporation's stock is acquired for purposes other than retirement, or when ultimate disposition has not yet been decided, the cost of acquired stock may be shown separately as a deduction from the total of capital stock, capital surplus, and retained earnings, or may be accorded the accounting treatment appropriate for retired stock. The

58

restatement resulted in increases in treasury stock of $17.3 million and $17.4 million at September 30, 2005 and December 30, 2004, respectively, and corresponding decreases in shareholders' equity of $17.0 million and $17.4 million as of September 30, 2005 and December 31, 2004, respectively.

(c)    The Company disclosed restatement adjustments for other unrelated adjustments of an immaterial nature individually that were either timing differences in the recording of amounts or corrections. The adjustments resulted in a aggregate increase in shareholders' equity of $3.6 million as of September 30, 2005 and a $59.2 million aggregate cumulative decrease in shareholders' equity as of December 31, 2004, comprised of a $30.5 million cumulative decrease in retained earnings, a $33.8 million cumulative net charge to the CTA and a $5.1 million cumulative increase in common stock.  It is impossible to know the specific GAAP provisions violated by the Company as they provided no further details as to the nature of these transactions.

(d)    Fairfax failed to record the minimum pension liability under US GAAP in accordance with SFAS No.87, *Employers' Accounting for Pensions*, which requires that an additional minimum liability must be recognized if an unfunded accumulated benefit obligation exists and the liability already recognized as unfunded accrued pension cost is less than the unfunded accumulated benefit obligation. The corrections resulted in increasing 2004 AOCI by $1.4 million and increasing 2003 AOCI by $0.3 million.

175.   Moreover, Fairfax "shifted" money through subsidiary "investments."   As reported by CW8, whenever MFX needed money, a new "investment" seemed to come in from another Fairfax subsidiary.

176.   CW8 also stated that Watsa directed MFX to use a London based company called "MI2G" for IT consulting work.   CW8 reported that he felt "certain" that Watsa was using MI2G, which he decried as "grossly over billing" Fairfax, to "funnel" money elsewhere.

177.   CW8 reported that he was one of only four people who would have been aware that MI2G was over billing Fairfax.   The other three people who, according to CW8, knew of this practice are Watsa, Sammy Y. Chan, President of Fairfax Asia, and Sanjay Thaqarai, a former MFX employee.

### E.   Fairfax's Accounting Tricks Have Their Intended Effect

178.   The use of finite reinsurance and other accounting gimmicks to shore up reserves had the intended effect on Fairfax's stock price.   On July 30, 2004, Watsa, during a telephone call with analysts, emphasized the importance of Fairfax achieving an investment grade ranking:

> Finally, I wanted to highlight the most important objective that we have for Fairfax; to be rated as investment grade again.   We plan to accomplish this as I said last quarter in the old-fashioned way, by producing excellent results and reducing our leverage at the holding company.   In this regard our objective is to significantly reduce if not eliminate all maturities in the next five years.   We have exchanged 40 percent of the 540 million coming due in 2005 and 2008 for our bonds due in 2012.   We are working on the rest of the maturities.

179.   On October 28, 2004, Fairfax announced that it would issue $300 million, or 2.4 million subordinate voting shares, to a number of institutional investors, including Southeastern Asset Management and Markel Corp. (no relation to Fairfax subsidiary Markel Insurance Co.). Commenting on the transaction, Watsa stated that the Company was raising significant equity at this time because of its "high priority of improving its ratings and deleveraging significantly. A

strong financial position with cash in excess of $600 million after this issue is the best way to handle uncertainty in our industry and in the economy generally."

180.    In response to Watsa's comments, the Company's share price soared. The stock, which had closed at $124.65 per share on October 28, 2004, gained $22.44 per share the following day (to close at $147.09). By the close of trading on November 15, 2004, Fairfax's shares stood at $160.75 per share – a 22.46% increase since the October 28th close. Fairfax's shares continued to climb over the next several weeks reaching as high as $176.60 per share as of the close of trading on December 6, 2004. The Company's stock price still stood at $163.70 per share as February 2005 came to a close.

181.    In late 2004, Fairfax announced that it had sold $200 million of its 7.75% Notes at an issue price of 99%. In connection with this transaction, Watsa stated that the Company's "financing goals for 2004 were to significantly deleverage our balance sheet, remove refinancing risk and maintain significant cash at the holding company. *When we close this debt issue, our equity financing announced on October 28, 2004 (which is subject to regulatory approval), and our debt tender offer, I believe we will have clearly met these goals."* (emphasis added).

182.    On February 10, 2005, the Company reported its fourth quarter and year-end 2004 results. The results reflected lower profits for the fourth quarter stemming from realized losses and the repurchase of outstanding debt and the placements of other reserves at subsidiaries (namely C&F). Quarterly revenues also declined over the prior period. Notwithstanding these facts, during a conference call on February 11, 2005, Watsa touted the Company's financial strength, stating that Fairfax had "strengthened [its] financial position" in 2004 and that "we are very excited about the prospects for our company in 2005 with excellent underwriting and investment capability that should serve our shareholders well over the long term."

183.    Two months later, on March 4, 2005, Fairfax asserted its compliance with those governance practices deemed standard under the securities laws.  In that regard, the Company stated in a press release that "its 2004 Annual Report . . . include[d] a report by management concluding that the company's internal control over financial reporting was effective as of December 31, 2004, and an opinion by Fairfax's independent auditors to the same effect. Neither management's report nor the auditors' [sic] opinion identified any material weaknesses in internal controls over financial reporting."  The Company's stock price gained $0.27 per share on that day to close at $165.48.  During that same month, the Company boasted that its "intrinsic value" had increased significantly in 2004 "because of the excellent performance of our ongoing insurance and reinsurance companies."

F.      **Fairfax Denies Wrongdoing In The Face of Regulatory Probes**

184.    On June 24, 2005, the Company issued a press release announcing that its subsidiary, Fairmont Specialty Group ("Fairmont"), had received a subpoena from the SEC regarding any non-traditional insurance product transactions entered into between General Re and Fairmont.

185.    While the Company's stock price declined by $3.00 per share on June 24, 2005, within a number of days, the share price had rebounded (by the end of June 2005, Fairfax's shares were trading at $166.00 per share).  The shares stood at $175.07 as July 2005 came to a close; but slipped to $167.55 by the end of August 2005.

186.    On September 7, 2005, Fairfax issued a press release stating that "the Fairfax group ha[d] received a subpoena" from the SEC "requesting documents regarding any non-traditional insurance/reinsurance product transactions entered into by the entities in that group and any non-traditional insurance/reinsurance products offered by the entities in that group."  On

that news, the Company's shares declined by $1.36 from the prior day's close of $166.15. Two weeks later (on September 21, 2005), Fairfax's shares were trading at $160.92.

187.    On September 26, 2005, Fairfax issued another press release under the headline: "Fairfax Receives Further Document Request As Part Of SEC Loss Mitigation Products Investigation."   While the headline was spun to give the impression that the new subpoena was just an extension of the finite reinsurance investigation, the text of the press release indicated otherwise.  There, the Company indicated that the SEC had requested "documents regarding any transactions in securities of Fairfax Financial, the compensation for such transactions and the trading volume or share price of such securities." Thus, it now appeared that securities regulators were investigating Fairfax on two different fronts (the trading of Fairfax securities, as well as the Company's use of finite insurance instruments).  On that same day, the *Wall Street Journal* reported that sources familiar with the federal probe of finite risk reinsurance stated that investigators were seeking to determine if Fairfax had improperly burnished its financial statements with nontraditional insurance pacts, including contracts with affiliated, offshore reinsurers.

188.    Fairfax also held its third annual investor conference on September 26, 2005.  At that time, the Company downplayed the significance of the SEC subpoenas – suggesting that it was tied solely to an industry-wide governmental investigation of reinsurance practices:

> We got the subpoena. It's, as you pointed out in your article, it's an industry investigation.... Any time we get a subpoena, we put it out. And the information we've said publicly we will provide all of the information that the SEC needs as far as any nontraditional or finite reinsurance is concerned. So there's about 30 companies, as you know, who got a subpoena from the SEC. We happen to be among the last who got it. And we are fully cooperating with the SEC in terms of information.

189.    While the Company's stock price slipped slightly on September 27, 2005 (by $0.31 per share to $162.75), Fairfax's stock increased in value over the following days – jumping to $174.10 by the close of trading on October 3, 2005.  On October 7, 2005, the Company's shares were trading close to $168.00.  The following day, however, Fairfax's shares took a big hit.

190.    On October 10, 2005, the *Journal* reported that federal prosecutors in New York had joined what it termed "a continuing probe by the Securities and Exchange Commission of [the Company's] financial statements in recent years."  According to the *Journal*, the U.S. Attorney's office in Manhattan had launched its probe "in recent weeks" and was "working in tandem, as it often does, with the SEC."  The *Journal* added that the SEC's investigation into Fairfax's books had reached "an advanced stage," with regulators interviewing several witnesses and experts.  Prior to the release of the *Journal* article, Fairfax had not disclosed the federal prosecutors' probe.

191.    The *Journal* reported that "a number of nontraditional reinsurance pacts struck by different companies have come under the spotlight.  Authorities are concerned that some of these companies have used the policies to understate losses and boost earnings. They do so, authorities say, by disguising loans as reinsurance proceeds, while booking the transactions with favorable insurance accounting."

192.    On the heels of the October 10, 2005 *Journal* article, Fairfax issued a press release.  However, rather than being candid (and describing the details and scope of the U.S. Attorneys' investigation), Fairfax was coy, stating only that "it ha[d] not received a subpoena or other information request from the U.S. Attorney's Office."  Yet, the very next day Fairfax was compelled to issue a "clarification," stating that while it understood that the U.S. Attorney's

office for the Southern District of New York would review information that the Company provided to the SEC, Fairfax had not been informed that it was a "target" of an investigation.

193.   As a result of the Company's October 10, 2005 disclosure (and the *Journal* report), the Company's share price dropped dramatically.  On that one day alone, the Company's stock lost $19.17 per share (to close at $149.00).  By the end of October 2005, Fairfax's stock price stood at $150.00 per share (down 13.84% from its close on October 3, 2005).

194.   At the close of trading on February 8, 2006, Fairfax's stock price stood at $150.45 per share.  The following day, Fairfax reported its fourth quarter results.  During a February 10, 2006 investor conference call, Watsa was asked to discuss the OdysseyRe restatement (and the pending subpoenas).   At that time, he asserted that an internal review of Fairfax's finite reinsurance contracts had found accounting issues only with those at OdysseyRe:

> TOM MACKINNON, ANALYST, SCOTIA CAPITAL: Good morning.  In the press release you mentioned that OdysseyRe had announced the result of an internal review.  It is finite contracts and they had to do a minor restatement in the release that you put out that it is not going to have any material impact on you. But have you done an internal review of all your finite contracts and if so, what was the result of that?

> PREM WATSA: Yes, that is a good question, Tom.  We have of course with the focus on the industry on finite contracts, we have done a complete review of all our companies, all our contracts, and across Fairfax and its subsidiaries, across Fairfax and one or two of the -- a few contracts that we have had at the holding company. And I am happy to tell you that that's the OdysseyRe restatement were the only ones that did come up.... *[W]e are happy to say that we have been a full review by us and by our independent auditors and those were the only ones that came up.*

(emphasis added).  The Company's shares declined by $4.78 per share to close at $147.00 at the end of that day.

G.     The Truth Begins To Emerge: The March 22, 2006 Press Release

195.    Shortly after Watsa declared that after a "complete review of all our companies, all our contracts, and across Fairfax and its subsidiaries . . . the OdysseyRe restatement were the only ones that did come up," on March 22, 2006, Fairfax issued a press release titled, "Subpoena Update."

196.    The March 22, 2006 press release, stated that SEC subpoenas had been issued to the Company and its affiliates and reiterated that the U.S. Attorney's office for the Southern District of New York was reviewing documents produced to the SEC by the Company and was participating in the investigation of the matters being probed by the SEC. The Company also announced that it had "prepared presentations and provided documents to the SEC and the U.S. Attorney's office" and that "its employees, including senior officers, have attended or have been requested to attend interviews conducted by the SEC and the U.S. Attorney's office."

197.    At this same time, the Company noted that Fairfax and Watsa had both received subpoenas from the SEC in connection with Watsa's comments on the February 10, 2006 investor conference call concerning the internal review of the Company's finite insurance contracts.

198.    Specifically, the Subpoena Update noted that:

As part of the 2005 year-end reporting and closing process, Fairfax and its subsidiaries internally reviewed all of the contracts on the list provided to the SEC and some additional contracts as deemed appropriate. That review led to the restatement by OdysseyRe. That review also led to some changes in accounting for certain contracts at nSpire Re which were immaterial at the consolidated Fairfax level.

199.    Thus, while Watsa was seeking to assure investors that Fairfax's improper use of finite reinsurance contracts was limited to OdysseyRe, the Company had months earlier provided

the SEC with a list of contracts which led to "changes in accounting" at another Fairfax subsidiary.

200.    The Company added that it "continues to respond to requests for information from the SEC" and that "there can be no assurance that the SEC's review of documents provided will not give rise to further adjustments."

201.    The Company further stated that the SEC also had issued subpoenas to "various third parties involved in the matters which are the subject of the SEC subpoenas" issued to the Company, including the Company's independent auditors, and a shareholder.

202.    Fairfax further noted that it was possible "that other governmental and enforcement agencies will seek to review information related to these matters, or that the company, or other parties with whom it interacts, such as customers or shareholders, may become subject to direct requests for information or other inquiries by such agencies." The Company also indicated that it could not predict the outcome from these continuing inquiries, or the ultimate effect on its business, "which effect could be material and adverse."

203.    The press release was interpreted by the markets as indicating that Fairfax had, in earlier comments, improperly downplayed the pending governmental investigations and subpoenas. The press release (which represented Fairfax's first detailed disclosure of the breadth of the governmental investigations of its operations), sent the Company's securities (both debt and equity) into a tailspin.

204.    Following the Company's March 22, 2006 disclosure, Fairfax's stock suffered its biggest single day decline in approximately three years, falling from $130.90 to $113.93 per share, representing a decline in market capitalization of approximately $300 million, or approximately 13% of its value.

205.   In order to deflect attention away from the Company's conduct and the government's investigation, on July 26, 2006 Fairfax filed a suit against several short sellers alleging, *inter alia*, that the defendants manipulated the price of the Company's securities.

206.   The following day the Company announced that it needed to restate its financial results and as a result shareholders' equity would be reduced by $225 to $240 million. The Company's July 27, 2006 press release stated:

> During its review of the accounting implications of the above-announced commutation of the Swiss Re Cover, management identified various non-cash accounting errors arising primarily in 2001 and prior.
>
> At the end of 2001, Fairfax converted its consolidation process to a new consolidation accounting system which provided increased sophistication and control processes to deal with Fairfax's growth in size and international scope. Management previously believed that a consolidation journal entry related to the Swiss Re Cover was correct. However, when management began calculating the accounting impact of the commutation of the Swiss Re Cover, it determined that this historical consolidation journal entry did not eliminate and was instead associated with other erroneous non-cash accounting matters arising, as noted above, primarily in 2001 and prior.
>
> Upon the recommendation of management, the Audit Committee of Fairfax's Board of Directors decided today to restate Fairfax's financial statements for prior periods affected. Accordingly, although the restated amounts have not been finalized, Fairfax estimates that the impact of the restatement will be a decrease in shareholders' equity as at March 31, 2006 in an estimated range of $175 to $190 million (comprised in part of a reduction in the currency translation account and in part a reduction in retained earnings) related to the matters described in the preceding paragraph and, since all previously unrecorded errors, regardless of materiality, are included in a restatement, an estimated approximate $50 million related to previously unrecorded differences existing at March 31, 2006. These figures represent Fairfax's best current estimates of the effects of the restatement. Fairfax will also include in the restatement corrections of certain unrelated errors of an immaterial nature and corrections of certain previously recorded unrelated entries into the periods in which they occurred.

Fairfax believes that its current accounting system and internal controls appropriately address the former problem discovered, as described above, in the consolidation process. As part of the restatement process, Fairfax will assess the impact of this former problem on its control assessment under section 404 of the Sarbanes-Oxley Act.

\* \* \*

Until this restatement is completed, Fairfax's previously published annual and interim financial statements should not be relied upon. Fairfax anticipates that the restatement will be completed by the end of August 2006.

207.    On August 31, 2006, the Company announced that it had "filed its interim report for the six months ended June 30, 2006 and its restated consolidated financial statements and related disclosures pursuant to the restatement previously announced on July 27, 2006 . . . [and] as a result of the restatement, shareholders' equity decreased $235.3 million as at March 31, 2006. . . ."

208.    The Company's restated MD&A for the year ended December 31, 2005 (filed with the SEC on Form 6-K on September 5, 2006), admitted that the Company maintained ineffective controls and that the defective controls "resulted in the restatement of the company's consolidated financial statements for the years ended December 31, 2001 through 2005 and related disclosures."

## IX.    FAIRFAX'S RESTATEMENT REVEALS THAT ITS FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

### A.    Fairfax's Financial Statements Failed To Comply with Basic GAAP Principles

209.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. Those principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private

professional association, through three successor groups it established:   the Committee on Accounting Procedure; the Accounting Principles Board (the "Board"), and the Financial Accounting Standards Board (the "FASB") with the permission of the SEC (Accounting Series Release 150).

210.   The SEC requires that public companies prepare their financial statements in accordance with GAAP.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."   17 C.F.R. § 210.4-01(a)(1).   Management is responsible for preparing financial statements that conform to GAAP.  As noted by AICPA auditing standards ("AU"), § 110.02:

> Financial statements are management's responsibility ... [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

211.   Fairfax's financial statements filed with the SEC during the Class Period violated the following provisions of GAAP, among others discussed below:

(a)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASB Statement of Financial Accounting Concepts "SFAC" No. 1).

(b)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the