USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-9 MAR 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KENNETH PARKS, et al.,                          :

                Plaintiff,          :

      -against-                                :

FAIRFAX FINANCIAL HOLDING LIMITED, et al.,:

                Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION
AND ORDER
06 CV 2820 (GBD)

GEORGE B. DANIELS, District Judge:

    Lead plaintiffs, a family of investment funds managed by one of Canada's largest investment fund companies, (collectively, the "CI Funds" or "Lead Plaintiff"), filed the Amended Consolidated Class Action Complaint ("Complaint") seeking recovery on behalf of all other purchasers and acquirers of Fairfax Holdings Limited ("Fairfax" or the "Company") securities between May 21, 2003 and March 22, 2006, inclusive (the "class period").

    Lead Plaintiff's complaint alleges violations of the federal securities laws, under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a); and Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17 C.F.R. § 240.10b-5. The defendants in this action are Fairfax, a Canadian financial services holding company, which, through its subsidiaries, is engaged in property and casualty and reinsurance, investment management and insurance claims management; OdysseyRE Holdings Corporation ("OdysseyRe"), a Delaware underwriting corporation of which Fairfax is a majority owner;

1

Pricewaterhouse Coopers LLP, Fairfax's auditor during the relevant time period; and individual defendants associated with the company (the "Defendants").[1]

The Complaint alleges that the Company sold securities at artificially inflated prices as a result of Defendants' material misrepresentations and omissions regarding Company information. All Defendants, in several separate motions, moved to dismiss the complaint because, *inter alia*, the Court lacks subject matter jurisdiction over the case under Federal Rule of Civil Procedure 12(b)(1). Defendants' motions to dismiss are granted. This Court lacks jurisdiction over the foreign securities transactions assailed in the complaint. Lead Plaintiff's complaint is dismissed in its entirety without prejudice.

## Factual Background[2]

In 1984, Defendant Watsa and a former colleague, Tony Hamblin founded an investment management firm called Hamblin Watsa Investment Counsel. Watsa began to acquire struggling insurance companies and sought to turn around their core operations to achieve greater returns for increased profits. In 1985, Watsa acquired a Canadian trucking insurance company called Markel Financial Holdings. In 1987, Watsa reorganized Markel and the company was renamed Fairfax Financial Holdings Limited. Through the1980's and 1990's, Fairfax expanded through a series of acquisitions, including the acquisition of OdysseyRe.

---

[1] The individual defendants are V. Prem Watsa, Fairfax founder, Chief Executive Officer and Chairman, and OdysseyRe Chairman; Trevor J. Ambridge, Fairfax Chief Financial Officer ("CFO") up until May 13, 2005; Greg Taylor, Fairfax CFO as of May 13, 2005; M. Jane Williamson, Vice President and Chief Accounting Officer; Robert Hartog, Fairfax director and member of the audit committee; Anthony Griffiths, member of the audit committee; Bradley P. Martin, Fairfax Vice President and Corporate Secretary; and Brandon Sweitzer, member of Fairfax's governance, nominating, and compensation committees.
[2] The following facts are drawn from the allegations in the complaint, unless indicated otherwise.

2

According to Lead Plaintiffs, the lack of liquidity pressured Fairfax management to seek ways to create the appearance of adequate reserves. In order to accomplish this goal, Fairfax sought to raise capital in the United States securities market. Under United States law, however, the Company did not have the amount of reserves required before an insurance company may properly pay dividends to its shareholders. Lead Plaintiff alleges that Fairfax entered into several reinsurance contracts with a number of different entities to hide business losses. The complaint alleges that the Company accounted for these contracts as though they covered a portion of risk that in effect was not transferred. Lead Plaintiff alleged that had the reinsurance contracts been properly accounted for, Fairfax's liquidity crisis would have been exposed. Further, Lead Plaintiff alleges that the Company overstated the strength of its internal controls, and used offshore entities to conceal losses. Plaintiffs contend that these actions and corresponding representations formed part of a fraudulent scheme to inflate the stock price. The complaint alleges that disclosures, in the form of statements issued by Fairfax, and reports and articles from independent analysts, beginning in June of 2005, caused the Company's stock to decline. See Compl. ¶ 558.[3]

---

[3]The complaint lists the following disclosures: 1) June 24, 2005 Fairfax press release regarding SEC subpoena requesting information about one reinsurance contract; 2) September 7, 2005 Fairfax press release regarding SEC subpoena requesting information about any reinsurance contracts; 3) October 10, 2005 news articles regarding "the [DOJ] joining in the SEC investigation"; 4) October 11, 2005 Fairfax press release regarding DOJ intention to "review information that Fairfax provides to the SEC in response to SEC subpoenas but that Fairfax has not been advised that it is a target of an investigation by [the DOJ or US Attorney's Office]"; 5) February 10, 2006 conference call with analysts, including Individual Defendant Watsa's response to an analysts question regarding results of the Company's internal review of finite reinsurance contracts; the response identified OdysseyRe's reinsurance contract as the only one at issue; 6) March 22, 2006 Fairfax press release regarding Company presentations and interviews before both the SEC and the DOJ, noting that "Fairfax and Watsa had both received subpoenas from the SEC in connection with Watsa's comments on the February 10, 2006 [call with

## Standard of Review

"[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008). In reviewing a Fed. R. Civ. P. 12 motion, "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." NRDC v. Johnson, 461 F.3d 164, 171 (2d Cir. 2006). However, the plaintiff that is asserting "subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." See id. (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).[4] A district court may consider evidence outside the pleadings in resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). See Makarova, 201 F.3d at 113.

---

analysts]". See Compl. ¶¶ 558-67. Notably, many of the disclosures listed predate the statute of limitations deadline for Lead Plaintiff to bring its claim. Lead Plaintiff aims to overcome the defendants' statute of limitations defense by alleging that the disclosures were partial corrections, the complete fraud was revealed upon the Company's filing of its restatement, and that Lead Plaintiff did not have inquiry notice because the Company allegedly denied the reports. The Court declines to decide the statute of limitations issue because the motion is decided on other grounds.

[4] Lead Plaintiff aims to shift the burden to the defendants by arguing that, in this case, the merits are so intertwined with the jurisdictional issue, that the Rule 56 burden of proof standard should apply, namely that defendants have the burden of showing the absence of a material fact and that they prevail as a matter of law. Lead Plaintiff offers no argument or legal support for the proposition that this case is similar to other "intertwining" cases. Here, resolving the jurisdictional issue does not resolve the merits of the case. Lead Plaintiff has the burden of proving that the court has jurisdiction over the subject matter of its claims. Reference to matters outside of the pleadings does not shift the burden to the defendant. See Makarova pg. [CITE] Brooklyn Hosp. Ctr. v. Westport Ins. Cor., No. 03 Civ. 5190 (BSJ), 2004 U.S. Dist. LEXIS 6931, *7 (S.D.N.Y. Apr. 212004) Brown v. American Legion Cortland City Post, 64 F. Supp. 2d 96, 99 (N.D.N.Y. 1999) ("This type of a Rule 12(b)(1) motion need not be converted into a Rule 56 motion where extra pleading materials are considered.").

4

In applying federal securities laws to extraterritorial transactions, as in this case, the relevant inquiry for the Court is "whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to such transactions." Morrison, 547 F.3d at 170 (citing Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 125 (2d Cir. 1998) (internal quotations omitted); see also Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975) ("When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries."). The Second Circuit has explained that "it is consistent with the statutory scheme to infer that Congress would have wanted to redress harms perpetrated abroad which have a substantial impact on investors or markets within the United States." Morrison, 547 F.3d at 170. However, the Second Circuit has also found that "it would be erroneous . . . to assume that the legislature always means to go to the full extent permitted." Bersch, 519 F.2d at 985 (citing Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1334 (2d Cir. 1972)).

In determining subject matter jurisdiction over transnational securities fraud,[5] the Second Circuit applies the "conduct" and "effects" tests. Under the conducts and effects tests, the Court asks: "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens."

---

[5] Lead Plaintiff does not allege that any of the securities were purchased on the New York Stock Exchange (the "NYSE"). The complaint merely states that "Fairfax's subordinate voting shares were traded in the United States on the NYSE throughout the [c]lass [p]eriod" (Compl. ¶ 63.)

5

Morrison, 547 F.3d at 171 (citing SEC v. Berger, 322 F.3d 187, 192-93 (2d Cir. 2003). While both tests need not be met, the Court may consider both tests in combination to satisfy itself that the U. S. involvement alleged by the plaintiff warrants use of the judicial resources of the United States. Id.; See Itoba Ltd. V. LEP Group PLC, 54 F.3d 118, 121-24 (2d Cir. 1995) ("[A]n admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify exercise of jurisdiction by [a United States] court"). Lead Plaintiff argues that it has satisfied both tests.[6] This case involves Canadian plaintiffs who bought shares of a Canadian company on a Canadian stock exchange. The Court lacks subject matter jurisdiction over this action. Neither the conduct nor the effects test provide a jurisdictional basis for the alleged transnational securities law claims.

### *Conduct Test*

A federal court has subject matter jurisdiction under the conduct test if: "(1) the defendant' activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." See Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 122 (2d Cir. 1995) (citing Bersch, 519 F.2d at 987), cert. denied, 423 U.S. 1018 (1975) and Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991) (internal citations omitted). Furthermore, the Court's analysis focuses "not only on how much was done in the United States but also on how much

---

[6] In fourteen paragraphs of the amended complaint, Lead Plaintiff details this Court's alleged jurisdiction over the action. Compl ¶¶ 53-67. Lead Plaintiff primarily focuses on Fairfax's subsidiary and the fact that Fairfax filed documents with the SEC and that Fairfax's subordinate voting shares are traded on the NYSE. See id. Lead Plaintiff, however, fails to allege foreign conduct that had a substantial effect on investors in the United States. Nor are there factual allegations that demonstrate that the conduct in the United States perpetuated the fraud.

6

was done abroad." IIT, International Inv. Trust v. Cornfeld, 619 F.2d 909, 920-21 (2d Cir. 1980) ("Determination whether American activities 'directly' caused losses to foreigners depends not only on how much was done in the United States but also on how much . . . was done abroad.").

The present case presents what the Second Circuit has recognized as a "foreign-cubed" securities class action – a case where foreign plaintiffs sue a foreign issuer for violations of American securities laws based on transactions in foreign countries. See Morrison, 547 F.3d at 172. Lead Plaintiff alleges that Defendants orchestrated a massive scheme to manipulate Fairfax's financial appearance by improperly accounting for reinsurance contracts. Lead Plaintiff alleges that through Fairfax's subsidiary, OdysseyRe, Defendants used the United States as the primary base from which it conducted its scheme. Lead Plaintiffs' allegations concerning United States based conduct are severely limited, both in number, and jurisdictional significance. Lead Plaintiff's have failed to meet their burden under the conduct test.

The Second Circuit's decision in Morrison is illustrative. In Morrison, a defendant's subsidiary allegedly manipulated its internal books and records and sent the falsely inflated numbers from their United States office to defendant's headquarters in Australia. Morrison, 547 F.3d at 171. From its headquarters, defendants created and distributed public filings and related public statements as well as incorporated the allegedly falsified numbers in company-wide figures. Id. In that case, the first "foreign-cubed" securities class action to reach the Second Circuit, the Court found that the United States based subsidiary reported to defendant's Australian based headquarters, and that it was the job of defendant's Australian based headquarters to oversee operations and report to the shareholders and financial community. Id. at 176. The Second Circuit further explained that ensuring the accuracy of statements to the public

7

and potential investors is central to the responsibilities of defendant's Australian based headquarters. Therefore, as a practical matter the responsibility lies in Australia, not the United States. Accordingly, the Second Circuit determined that there was no subject matter jurisdiction over the action.

The instant case is similar. In support of their claim that jurisdiction exists based on the conduct test, Lead Plaintiff alleges that significant conduct of Fairfax's subsidiary, OdysseyRe occurred in the United States, including the execution of five reinsurance transactions and preparation of OdysseyRe's financial statements. Lead Plaintiff contends that Fairfax consolidated OdysseyRe's fraudulent financial results into Fairfax's financial statements which were prepared in Canada. Lead Plaintiff alleges that the inclusion of OdysseyRe's fraudulent transactions in Fairfax's financial statements artificially inflated Fairfax's assets. As in Morrison, the action taken by Fairfax was the gravamen of the fraud alleged in Lead Plaintiff's amended complaint. Lead Plaintiff alleges that Fairfax hid their liquidity problem and used improper accounting to artificially inflate Fairfax's stock price. While OdysseyRe's alleged conduct may have contributed to the alleged scheme, it is Fairfax's alleged conduct in Canada that defrauded investors and caused an inflated stock price. See Bersch, 519 F.2d at 981 (finding that "[t]he fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchaser's hands).

Further, as in Morrison, here there is a lengthy chain of causation between OdysseyRe's contribution to the misstatements and the harm to investors. While OdysseyRe may have been the original source of the misleading numbers, those numbers had to pass through Fairfax before reaching investors. See Morrison, 547 F.3d at 176; see also In re AstraZeneca Securities

8

Litigation, 559 F.Supp. 2d 453 (S.D.N.Y. 2008) (dismissing case for lack of subject matter jurisdiction where plaintiff, relying on a "fraud-on-the-market" theory, failed to show that United States based conduct directly caused losses of foreign investors.) This lengthy chain weights against this Court exercising subject matter jurisdiction.

Lead Plaintiff also highlights Fairfax's alleged substantial United States connections. Specifically, Lead Plaintiff references the number of United States subsidiaries and the amount of business Fairfax conducts in United States dollars. Lead Plaintiff also alleges that: Fairfax's subordinate voting shares and OdysseyRe are traded on the NYSE, and a member of the board of directors of Fairfax and OdysseyRe is an American citizen. Although this may demonstrate that Fairfax is engaged in business activity in the United States, the conduct test is primarily concerned with *wrongful acts* conducted in the United States, which were more than merely preparatory to a securities fraud, and which directly caused loss, not with the Defendants' legitimate business activity. More specifically, the conduct test is concerned with the United States activities that contributed to the securities fraud. Lead Plaintiff does not allege that the individual defendants worked out of the United States offices of OdysseyRe, or any other United States based Fairfax subsidiary or that Fairfax's most crucial departments, or for that matter, that any of its departments or units were contained in the United States. All but one of the individual defendants reside and operate in Canada. Nor does Lead Plaintiff allege that Fairfax's decision to incorporate OddysseyRe's financials was made or executed in the United States. Lead Plaintiff fails to establish the conduct test for subject matter jurisdiction.

9

*Effects Test*

Lead Plaintiff also alleges subject matter jurisdiction under the effects test. "A federal court also has jurisdiction under the 'effects' test where illegal activity abroad causes a 'substantial effect' within the United States." Alfadda v. Fenn, 935 F.2d 475, 478 (2d Cir. 1991) (citing Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 261-62 (2d Cir. 1989)); Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, (2d Cir. 1998) (explaining that the effects test concerns the impact of overseas activity on United States and securities traded on United States securities exchanges).

Lead Plaintiff alleges that this Court has subject matter jurisdiction over this action based on the effects test because "Defendants' fraudulent conduct had an impact upon the United States' markets and upon investors located within the United States." Compl. ¶ 54. Contrary to Lead Plaintiff's assertions, however, the Second Circuit has made clear that, "there is subject matter jurisdiction of fraudulent acts relating to securities which are committed abroad only when these result in injury to purchasers or sellers of those securities in whom the United States has an interest, *not where acts simply have an adverse affect on the American economy or American investors generally*." Bersch, 519 F.2d at 989 (emphasis added).

Furthermore, based on the allegations in the amended complaint, the United States interest affected in this action is minimal, at best. Lead Plaintiff, a family of investment funds managed by one of Canada's largest investment fund companies is a foreign entity. Since Lead Plaintiff fails to allege that any shares were bought or sold by investors on the New York Stock

10

Exchange. This case involves foreign purchasers who acquired securities in a foreign exchange.[7] Indeed, Lead Plaintiff stated in their Memorandum of Law in Support of their Motion to be Appointed as Lead Plaintiff, that the funds "purchased 197,925 shares of Fairfax common stock on the Toronto Stock Exchange." Injury to purchasers or sellers in whom the *United States has an interest* is therefore attenuated. See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 128 (2d Cir. 1998) ("[T]he plaintiff is a Panamanian corporation; the individual who placed the purchase orders, and who ultimately suffered any losses, is a Canadian citizen; the securities are not traded on a U.S. exchange; and no effect on a U.S. affiliated company is alleged . . . .").

Lead Plaintiff also asserts that Fairfax made a note offering to United States investors and filed a prospectus in August 2004, and that Fairfax made filings with the SEC. However, the effects test focuses on conduct abroad that caused a 'substantial effect' within the United States. Lead Plaintiff fails to indicate that any conduct in Canada caused a United States investor to suffer a loss. Lead Plaintiff's conclusory allegations that Defendants' fraud had a significant effect on unnamed Fairfax securities holders in the United States is insufficient. See See Euro Trade & Forfaiting, Inc.,2002 WL 500672, at *9 (finding that there was no jurisdiction under the effects test when plaintiffs complaint refers merely to "unsuspecting investors and lenders," and failed to specify any American shareholders or investors who suffered losses).

---

[7] Moreover, whether NYSE traded in Fairfax stock may be relevant, but it is not a determinative factor. The relevant inquiry is whether, and to what extent, United States investors are harmed. See Euro Trade & Forfaiting, Inc. v. Vowell, No. 00 CIV. 8431(LAP), 2002 WL 500672, at *9 (S.D.N.Y. march 29, 2002) (finding no jurisdiction in case where stock was traded on an American market but no specific harm to American investors' interests was specified).

11

Lead Plaintiff simply does not provide this Court with a sufficient basis to conclude that the foreign conduct resulted in jurisdictionally significant domestic effects in the United States. Lead Plaintiff has not met its burden under either the conduct or effects test.

## Conclusion

Defendants' motions to dismiss pursuant to Rule 12(b)(1) is granted. This case is dismissed in its entirety for lack of subject matter jurisdiction as to all defendants.[8]

Dated: New York, New York
       March 29, 2010

SO ORDERED:

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

---

[8] Plaintiff's request to move for leave to file a second amended complaint is denied as futile. See In re Winstar Communications, Jefferson Insurance Co. of NY v. Rouhana, No. 01 Civ. 3014 (GBD), 2006 WL 473885, *1 (S.D.N.Y. Feb. 27, 2006) ("Where the proposed amended complaint would not withstand a motion to dismiss, the granting of a leave to amend would be futile, and hence the motion should be denied.").